**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:22-cv-01716-TSC |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | |
| Defendants, | |
| and | |
| AMERICAN PETROLEUM INSTITUTE, *et al.*, | |
| Intervenor-Defendants. | |

**INTERVENOR-DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

    A.    BLM's Management of Federal Lands ................................................ 3

    B.    BLM's Management of Oil and Gas Leasing ..................................... 4

    C.    Plaintiffs' Challenges to BLM's APD Approvals ............................. 6

LEGAL STANDARDS ...................................................................................... 8

ARGUMENT ..................................................................................................... 9

I.    Plaintiffs Fail Plausibly To Allege Article III Standing. ............................ 10

    A.    Plaintiffs Do Not Plausibly Allege Organizational Standing to Vacate the Challenged APD Decisions.................................................. 11

    B.    Plaintiffs Do Not Plausibly Allege Associational Standing to Vacate the Challenged APD Decisions.................................................. 13

        1.    Plaintiffs Do Not Adequately Allege a Cognizable Injury-in-Fact Because They Have Not Identified Any Member With an Interest in Any Particular Challenged APD.......................................... 14

        2.    Plaintiffs Fail Plausibly to Allege Traceability and Redressability. ......... 22

II.    The MLA's Statute Of Limitations Bars Plaintiffs' Challenges To At Least 3,869 Of The APD Approvals. .................................................. 26

    A.    Section 226-2's Specific Statute of Limitations Applies to All of Plaintiffs' Causes of Action. .................................................. 26

    B.    NEPA (and the Other Relied-Upon Statutes) Do Not Salvage Plaintiffs' Time- Barred Challenges. .................................................. 32

III.    Plaintiffs' Failure To Raise Their Challenges Initially With Federal Defendants Bars Plaintiffs' Claims. .................................................. 38

CONCLUSION .................................................................................................. 41

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Alford v. Providence Hosp.*,
    60 F. Supp. 3d 118 (D.D.C. 2014) ................................................................. 8

*Allied-Bruce Terminix Co. v. Dobson*,
    513 U.S. 265 (1995) ..................................................................................... 29

*Am. Chemistry Council v. Dep't of Transp.*,
    468 F.3d 810 (D.C. Cir. 2006) ..................................................................... 15

*Am. Forest Res. Council v. Ashe*,
    946 F. Supp. 2d 1 (D.D.C. 2013) ................................................................. 39

*Am. Petroleum Inst. v. EPA*,
    216 F.3d 50 (D.C. Cir. 2000) ....................................................................... 25

*Appalachian Voices v. Bodman*,
    587 F. Supp. 2d 79 (D.D.C. 2008) ........................................................ 16, 17

*Arizonans for Official English v. Arizona*,
    520 U.S. 43 (1997) ....................................................................................... 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................... 8

*AT&T Inc. v. FCC*,
    452 F.3d 830 (D.C. Cir. 2006) ..................................................................... 29

*Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. BLM*,
    584 F. Supp. 3d 949 (D. Colo. 2022) ............................................................ 4

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................... 22, 24

*Berka v. Nuclear Regul. Comm'n*,
    No. 21-1134, 2022 WL 412470 (D.C. Cir. Feb. 3, 2022) ........................... 20

*Block v. N. Dakota ex rel. Bd. Of Univ. & Sch. Lands*,
    461 U.S. 273 (1983) ......................................................................... 26, 36, 37

*Calif. Save Our Streams Council, Inc. v. Yeutter*,
    887 F.2d 908 (9th Cir. 1989) .................................................................. 33, 37

*California v. Watt*,
    668 F.2d 1290 (D.C. Cir. 1981) ................................................................... 33

*California v. Watt*,
    712 F.2d 584 (D.C. Cir. 1983) ..................................................................... 33

*Cartwright Int'l Van Lines, Inc. v. Doan*,
    525 F. Supp. 2d 187 (D.D.C. 2007) ............................................................... 8

*Authorities chiefly relied upon

*Chamber of Com. v. EPA,*
  642 F.3d 192 (D.C. Cir. 2011) ........................................................... 21

*City of Dania Beach, Fla. v. FAA,*
  485 F.3d 1181 (D.C. Cir. 2007) ......................................................... 22

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ............................................................................ 19

*City of Olmsted Falls v. FAA,*
  292 F.3d 261 (D.C. Cir. 2002) ..................................................... 15, 23

*City of Rochester v. Bond,*
  603 F.2d 927 (D.C. Cir. 1979) ........................................................... 32

*City of Scottsdale, Ariz. v. FAA,*
  37 F.4th 678 (D.C. Cir. 2022) ........................................................... 17

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) ........................................................... 24

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
  355 F.3d 678 (D.C. Cir. 2004) ........................................................... 33

*Coal. for Mercury-Free Drugs v. Sebelius,*
  671 F.3d 1275 (D.C. Cir. 2012) ......................................................... 19

*Conservation Law Foundation v. Mineta,*
  131 F. Supp. 2d 19 (D.D.C. 2001) ..................................................... 36

*Conway v. Watt,*
  717 F.2d 512 (10th Cir. 1983) ............................................................. 5

*\*Ctr. for Biological Diversity v. Dep't of Interior,*
  563 F.3d 466 (D.C. Cir. 2009) ........................... 14, 20, 21, 22, 24, 33

*Ctr. for Biological Diversity v. EPA,*
  937 F.3d 533 (5th Cir. 2019) ..................................................... 15, 18, 19

*Ctr. for Biological Diversity v. Lueckel,*
  417 F.3d 532 (6th Cir. 2005) ............................................................. 21

*Ctr. for Biological Diversity v. Regan,*
  597 F. Supp. 3d 173 (D.D.C. 2022) ..................................................... 8

*Ctr. for Biological Diversity v. U.S. EPA,*
  847 F.3d 1075 (9th Cir. 2017) ...................................................... 27, 28

*Ctr. for Law & Educ. v. Dep't of Educ.,*
  396 F.3d 1152 (D.C. Cir. 2005) ........................................ 11, 12, 13, 14

*Ctr. for Sustainable Econ. v. Jewell,*
  779 F.3d 588 (D.C. Cir. 2015) ........................................................... 33

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ............................................................................ 8

*Davis v. Fed. Election Comm'n,*
    554 U.S. 724 (2008) ................................................................................................. 2

*Demby v. Schweiker,*
    671 F.2d 507 (D.C. Cir. 1981) ................................................................................. 30

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ................................................................................................. 39

*E. Band of Cherokee Indians v. U.S. Dep't of Interior,*
    534 F. Supp. 3d 86 (D.D.C. 2021) ........................................................................... 24

*Edwardsen v. U.S. Dep't of the Interior,*
    268 F.3d 781 (9th Cir. 2001) ................................................................................... 32

*Env't Def. Fund v. FERC,*
    2 F.4th 953 (D.C. Cir. 2021) ............................................................................. 14, 24

*Equal Rts. Ctr. v. Post Props., Inc.,*
    633 F.3d 1136 (D.C. Cir. 2011) ............................................................................... 11

*Ex parte McCardle,*
    7 Wall. 506 (1868) ................................................................................................... 26

*\*ExxonMobil Oil Corp. v. FERC,*
    487 F.3d 945 (D.C. Cir. 2007) ........................................................................... 38, 39

*\*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) .......................................................... 14, 15, 16, 19, 20, 22

*\*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ....................................................................... 11, 12, 14

*Friends of Animals v. Bernhardt,*
    961 F.3d 1197 (D.C. Cir. 2020) ............................................................................... 11

*Friends of The Earth, Bluewater Network Div. v. U.S. Dep't of Interior,*
    478 F. Supp. 2d 11 (D.D.C. 2007) ................................................................. 13, 15, 23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ................................................................................................. 15

*Friends of Tims Ford v. Tenn. Valley Auth.,*
    585 F.3d 955 (6th Cir. 2009) ................................................................................... 25

*Geertson Farms, Inc. v. Johanns,*
    439 F. Supp. 2d 1012 (N.D. Cal. 2006) ................................................................... 33

*Goos v. Interstate Com. Comm'n,*
    911 F.2d 1283 (8th Cir. 1990) ................................................................................. 32

*Gov't of Manitoba v. Bernhardt,*
    923 F.3d 173 (D.C. Cir. 2019) ................................................................................. 26

*Grand Lodge of Fraternal Ord. of Police v. Ashcroft,*
    185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................................... 8

*Gulf Restoration Network v. Salazar*,
  683 F.3d 158 (5th Cir. 2012) ............................................................ 39, 40, 41

*Harvey v. Udall*,
  384 F.2d 883 (10th Cir. 1967) .................................................................. 5

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................................ 10

*Heartwood, Inc. v. Agpaoa*,
  628 F.3d 261 (6th Cir. 2010) ................................................................... 19

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) ................................................................................ 15

*Howard v. Pritzker*,
  775 F.3d 430 (D.C. Cir. 2015) .......................................................... 28, 33

*Hurd v. District of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017) ................................................................. 9

*Impact Energy Res., LLC v. Salazar*,
  693 F.3d 1239 (10th Cir. 2012) ............................................................. 28

*Irwin v. Dep't of Veterans Affairs*,
  498 U.S. 89 (1990) .................................................................................. 29

*Jackson v. Modly*,
  949 F.3d 763 (D.C. Cir. 2020) ............................................................ 9, 31

*Jones v. Gordon*,
  792 F.2d 821 (9th Cir. 1986) ..................................................... 28, 35, 36

*Kannikal v. Att'y Gen. United States*,
  776 F.3d 146 (3rd Cir, 2015) ................................................................. 28

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................ 11

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................ 1, 8, 9, 10, 11, 15, 16, 18, 20, 22

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .......................................................................... 18, 27

*Maniaci v. Georgetown Univ.*,
  510 F. Supp. 2d 50 (D.D.C. 2007) ........................................................... 9

*Media Access Project v. FCC*,
  883 F.2d 1063 (D.C. Cir. 1989) ............................................................. 33

*MEIC v. Haaland*,
  No. 19-cv-130, 2022 WL 4592071 (D. Mont. Sept. 30, 2022) ............... 17

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ............................................................. 27

*Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*,
  143 F. Supp. 2d 19 (D.D.C. 2001) ................................................................ 31, 32

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ................................................................................... 28, 29

*Nagahi v. INS*,
  219 F.3d 1166 (10th Cir. 2000) ......................................................................... 28

*Nat. Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ......................................................................... 33

*Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv. of Am., Inc.*,
  462 U.S. 810 (1983) ......................................................................................... 30

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ............................................................... 12, 14, 25

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ....................................................................... 12

*Nat'l Treasury Emps. Union v. Whipple*,
  636 F. Supp. 2d 63 (D.D.C. 2009) ................................................................... 23

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
  170 F. Supp. 3d 6 (D.D.C. 2016) .............................................................. 17, 25

*New Jersey Dep't of Env't Prot. & Energy v. Long Island Power Auth.*,
  30 F.3d 403 (3d Cir. 1994) .............................................................................. 32

*New York v. Nuclear Regul. Comm'n*,
  681 F.3d 471 (D.C. Cir. 2012) ......................................................................... 39

*Norton v. S. Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ........................................................................................... 27

*Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp.*,
  457 F.3d 956 (9th Cir. 2006) ..................................................................... 32, 33

*Ord v. District of Columbia*,
  587 F.3d 1136 (D.C. Cir. 2009) ......................................................................... 8

*Park Cnty. Res. Council, Inc. v. U.S. Dep't of Agric.*,
  817 F.2d 609 (10th Cir. 1987) ....................................................... 35, 36, 37, 38

*Pollack v. United States Dep't of Just.*,
  577 F.3d 736 (7th Cir. 2009) ........................................................................... 19

*Pub. Emps. for Env't Resp. v. Bernhardt*,
  No. 18-cv-1547, 2020 WL 601783 (D.D.C. Feb. 7, 2020) ........................ 16, 18

*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) ......................................................................... 25

*San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*,
  257 F. Supp. 2d 133 (D.D.C. 2003) ....................................................... 18, 20, 24

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002) ................................................................. 13, 24

*Sierra Club v. EPA,*
   755 F.3d 968 (D.C. Cir. 2014) ....................................................................... 23

*Sierra Club v. Perry,*
   373 F. Supp. 3d 128 (D.D.C. 2019) ............................................................... 13

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ................................................................... 2, 10, 25, 26

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ............................................ 14, 15, 17, 18, 19, 21

*Theodore Roosevelt Conservation P'ship v. Salazar,*
   616 F.3d 497 (D.C. Cir. 2010) ................................................................. 4, 27

*Town of Chester v. Laroe Ests., Inc.,*
   581 U.S. 433 (2017) ..................................................................................... 2

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ................................................................................. 11

*Turlock Irrigation Dist. v. FERC,*
   786 F.3d 18 (D.C. Cir. 2015) ....................................................................... 12

*Turtle Island Restoration Network v. U.S. Dep't of Commerce,*
   438 F.3d 937 (9th Cir. 2006) ........................................ 28, 34, 35, 36, 37

*United States v. Gonzales,*
   520 U.S. 1 (1997) ......................................................................................... 29

*United States v. L.A. Tucker Truck Lines, Inc.,*
   344 U.S. 33 (1952) ................................................................................. 3, 38

*Utah v. Babbitt,*
   137 F.3d 1193 (10th Cir. 1998) ............................................................. 26, 27

*Weinberger v. Bentex Pharms., Inc.,*
   412 U.S. 645 (1973) ..................................................................................... 39

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,*
   5 F.4th 997 (9th Cir. 2021) ......................................................................... 16

*WildEarth Guardians v. Bernhardt,*
   501 F. Supp. 3d 1192 (D.N.M. 2020) ............................................................ 5

**Statutes**

5 U.S.C. § 701(a) ............................................................................................ 28

5 U.S.C. § 702(1) ............................................................................................ 27

5 U.S.C. §§ 551, *et seq.* ................................................................................... 1

16 U.S.C. § 1374(d)(6) ................................................................................... 36

16 U.S.C. § 1540(g)(1) ................................................................................ 27

16 U.S.C. § 1855(f) ..................................................................................... 34

16 U.S.C. §§ 1531, *et seq.* ............................................................................ 1

28 U.S.C. § 1331 ......................................................................................... 32

28 U.S.C. § 2344 ......................................................................................... 32

28 U.S.C. § 2401 ....................................................................... 27, 28, 32, 34, 37

30 U.S.C. § 181 ............................................................................................. 4

30 U.S.C. § 21a ............................................................................................. 4

30 U.S.C. § 226(b)(1)(A) ............................................................................... 5

30 U.S.C. § 226(e)(1) .................................................................................... 5

30 U.S.C. § 226(e)(2) .................................................................................... 5

30 U.S.C. § 226(e)(3) .................................................................................... 5

30 U.S.C. § 226(g) ........................................................................................ 6

30 U.S.C. § 226(p)(2)(A) ............................................................................... 6

*30 U.S.C. § 226-2 ................................................................... 2, 6, 29, 30, 36

42 U.S.C. §§ 4321, *et seq.* ............................................................................ 1

43 U.S.C. § 1701(a)(12) ................................................................................. 4

43 U.S.C. § 1701(a)(8) ................................................................................... 4

43 U.S.C. § 1732(a) ....................................................................................... 3

43 U.S.C. § 1732(b) ....................................................................................... 4

43 U.S.C. §§ 1701, *et seq.* ............................................................................ 1

Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 ............................................ 5

**<u>Other Authorities</u>**

*Attorney General's Manual on the Administrative Procedure Act* ................................. 27

*S. Rep. No. 86-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3313 ................... 6, 26, 29, 30

**<u>Rules</u>**

Federal Rule of Civil Procedure 12(b)(1) ................................................... 8, 9

Federal Rule of Civil Procedure 12(b)(6) ............................................. 8, 10, 31

Federal Rule of Civil Procedure 12(c) .......................................................... 9

Federal Rule of Civil Procedure 12(h)(3) .................................................... 8, 9

Federal Rule of Civil Procedure 24(c) ........................................................... 9

**<u>Regulations</u>**

43 C.F.R. § 1601.0-6 ........................................................................................................ 4

43 C.F.R. § 1610.5-1 ........................................................................................................ 4

43 C.F.R. § 3120.1-2(b) .................................................................................................... 5

43 C.F.R. § 3120.5-3 ........................................................................................................ 5

43 C.F.R. § 3162.3-1(c) ................................................................................................. 5, 6

43 C.F.R. § 3162.5-1(a) .................................................................................................... 6

43 C.F.R. § 3165.3 .......................................................................................................... 40

43 C.F.R. § 3185.1 .......................................................................................................... 40

43 C.F.R. § 46.100(a) ....................................................................................................... 5

## INTRODUCTION

In a lawsuit of breathtaking scope, Plaintiffs Center for Biological Diversity, Citizens Caring for the Future, New Mexico Interfaith Power and Light, and WildEarth Guardians (collectively, "Plaintiffs") challenge the Biden Administration's individual approvals of more than 4,000 separate applications for permits to drill ("APDs") on federal oil and gas leases in New Mexico and Wyoming. *See* Amend. Compl. (Dkt. No. 57), ¶ 1. Plaintiffs contend that these APD approvals by Defendants U.S. Department of the Interior ("Interior"), Secretary of the Interior, the Bureau of Land Management ("BLM"), and Director of the BLM (collectively, the "Federal Defendants") violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*.; the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq*.; the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701, *et seq*.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq*. Amend. Compl., ¶ 1. Plaintiffs contend that NEPA, the ESA, and FLPMA sweepingly require BLM as part of each unique APD approval process to cumulatively assess the climate and environmental-justice impacts of all foreseeable drilling on all federal lands; to consider the effects of that drilling on all endangered species everywhere in the United States and perhaps everywhere in the world; and to prohibit or aggressively mitigate oil and gas exploration on federal property. *See id*., ¶¶ 1, 4.

Plaintiffs' challenges to the APD approval decisions are barred by at least three threshold limitations on judicial review of agency action.

First, Plaintiffs have failed to plausibly plead standing to challenge each and every of the some 4,000 APD approvals listed in their Amended Complaint. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, Plaintiffs must plausibly allege (and ultimately prove) that they suffer a cognizable injury that is fairly traceable to BLM's APD approval

decisions, and that is redressable by an order from this Court vacating the approvals. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03 (1998). But this threshold jurisdictional requirement cannot be met through sweeping, conclusory allegations of injuries that are impossible to trace to each individual APD approval. Standing is "not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Yet Plaintiffs attempt to challenge in bulk more than 4,000 individual APD approval decisions spread across tens of thousands of square miles in New Mexico and Wyoming. *See, e.g.*, Amend. Compl., ¶¶ 102–03. But each approval decision is a separate regulatory action representing BLM's individual assessment of unique facts and circumstances, including location, timing, and procedural process.

It is not enough for Plaintiffs to assert standing to challenge *some* of the APD approvals—although they fail to do even that. Plaintiffs must plausibly plead standing for each APD decision they seek to vacate. Because Plaintiffs fail plausibly to allege any particularized injury to individual members of their organizations due to the approval of any specific, particular APD across the vast area challenged, the Amended Complaint lacks the geographic nexus necessary to establish a cognizable Article III injury-in-fact. Given the extensive existing oil and gas development in the areas containing the APDs challenged by Plaintiffs, and the worldwide scope of the alleged climate-change impacts underlying Plaintiffs' claims, the Amended Complaint likewise fails to satisfy Article III's traceability and redressability requirements. All of Plaintiffs' claims should thus be dismissed for lack of standing.

Second, the Federal Defendants issued the challenged APD approval decisions pursuant to the Mineral Leasing Act, which imposes a 90-day statute of limitations on challenges—like Plaintiffs'—to any decision "involving" any oil and gas lease. 30 U.S.C. § 226-2 ("Section 226-

2"). Congress expressly imposed this short, specific limitations period as part of an effort to promote oil and gas development. This specific limitations period, which governs the agency action under the MLA before such action gives rise to claims such as those in this lawsuit, supersedes more general limitations periods, including those that apply to claims under the ESA. And Congress expressly imposed it on claims like Plaintiffs' brought pursuant to the APA. Section 226-2's limitations period is broadly worded, must be strictly enforced, and had already run with respect to more than 3,800 of the challenged APD approval decisions when Plaintiffs filed their initial and amended complaints. Plaintiffs' claims challenging those approved APDs should be dismissed as time-barred.

Finally, a party allegedly aggrieved by an agency action must first raise its grievances with the agency. As the Supreme Court explained when setting this precedent 70 years ago, "orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Even though Plaintiffs have monitored and challenged BLM's oil and gas leasing and development actions numerous times in recent years, Plaintiffs do not allege that they raised any of the NEPA, ESA, or FLPMA issues underlying their claims with BLM before proceeding to this Court. Having eschewed agency review and the opportunity for the BLM to correct any alleged failures, Plaintiffs cannot raise before this Court the issues they failed first to bring to the attention of Federal Defendants. All of Plaintiffs' claims should be dismissed on this independent ground as well.

## BACKGROUND

### A.   BLM's Management of Federal Lands

Under FLPMA, BLM "manage[s] the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). BLM must plan in a manner that: (i) will protect scenic,

historical, ecological, and environmental values, *see id.* § 1701(a)(8); and (ii) "recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands," *id.* § 1701(a)(12).  While BLM has a responsibility to "prevent unnecessary or undue degradation of the [public] lands," *id.* § 1732(b), accounting for the productivity of the federal mineral estate is an FLPMA imperative.  *E.g.*, *id.* § 1701(a)(12) (explaining policy that "the public lands be managed in a manner" consistent with "the Mining and Minerals Policy Act of 1970"); 30 U.S.C. § 21a ("[I]t is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . the development of economically sound and stable domestic mining, minerals [including oil, gas, coals, oil shale and uranium], and minerals reclamation industries, . . . [and] the orderly and economic development of domestic mineral resources . . . ."); *id.* ("It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law . . . .").

BLM "uses a multi-step planning and decisionmaking process to fulfill" FLPMA's mandates.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010).  BLM "begins by creating" a resource management plan ("RMP"), which "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."  *Id.* (quotation omitted).  Thereafter, "[s]pecific projects are reviewed and approved separately, but must conform to the relevant RMP."  *Id.*  BLM prepares an EIS pursuant to NEPA when preparing an RMP.  *See* 43 C.F.R. § 1610.5-1; *id.* § 1601.0-6.  "Additionally, during preparation of the RMP, the BLM considers the effects to listed and proposed species under the ESA."  *Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. BLM*, 584 F. Supp. 3d 949, 957 (D. Colo. 2022).

### B.    BLM's Management of Oil and Gas Leasing

BLM integrates its FLPMA process with its congressionally directed obligations under the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181.  Through the MLA, Congress mandated that oil

and gas "[l]ease sales shall be held for each State where eligible [federal] lands are available at least quarterly."  *Id.* § 226(b)(1)(A); *see also* Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 (purpose of MLA is "[t]o promote the mining of . . . oil . . . on the public domain"); *Conway v. Watt*, 717 F.2d 512, 514 (10th Cir. 1983) (congressional purpose behind the MLA "was the development of western portions of the country"); *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (MLA's "purpose . . . was to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise" (quotation omitted)).

Lease sales are conducted through a competitive bidding process.  *See* 43 C.F.R. § 3120.1-2(b); *id.* § 3120.5-3.  The Secretary of the Interior—acting through BLM—awards the oil and gas lease to the party with the highest bid at the lease sale "60 days following payment by the successful bidder of the remainder of the" bid made at the lease sale.  *See* 30 U.S.C. § 226(b)(1)(A). The leases are issued "for a primary term of 10 years."  *Id.* § 226(e)(1).  As an incentive to fulfill the MLA's developmental purpose, the lease will expire after its primary term unless "oil or gas is produced in paying quantities."  *See id.* § 226(e)(2); *id.* § 226(e)(3) ("Any lease issued under this section for land on which . . . actual drilling operations were commenced and diligently prosecuted prior to the end of the primary term of the lease shall be extended for [two] years and for any period thereafter during with oil or gas is produced in paying quantities.").  And BLM satisfies NEPA requirements before it issues an oil and gas lease.  *See* 43 C.F.R. § 46.100(a); *WildEarth Guardians v. Bernhardt*, 501 F. Supp. 3d 1192, 1199 (D.N.M. 2020) ("BLM's leasing process requires voluminous documentation and must comport with [NEPA] and its implementing regulations.").

Prior to any drilling activity, the lease "operator shall submit . . . for approval an [APD] for each well."  43 C.F.R. § 3162.3-1(c).  "No drilling operations, nor surface disturbance preliminary

thereto, may be commenced prior to the authorized [BLM] officer's approval of the permit." *Id.*; *see also* 30 U.S.C. § 226(g). NEPA requirements must be satisfied before BLM can issue a permit, 30 U.S.C. § 226(p)(2)(A), and the NEPA review is "used in determining whether or not an [Environmental Impact Statement] is required and in determining any appropriate . . . conditions of approval of the submitted plan," 43 C.F.R. § 3162.5-1(a).

In 1960, Congress amended the MLA's leasing provisions. Among other things, Congress enacted Section 226-2, which provides:

> No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.

30 U.S.C. § 226-2. Through this provision, Congress sought to create a "statute of limitations providing that any action under the Administrative Procedure Act to review a decision of the Secretary involving an oil and gas lease must be initiated within 90 days after the final decision of the Secretary." S. Rep. No. 86-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3313, 3317; *see also id.* at 3337. More broadly, through the 1960 MLA amendments Congress aimed to reverse "a potentially dangerous slackening in exploration for development of domestic reserves of oil and gas" by "remov[ing] certain legislative obstacles to exploration for development of the mineral resources of the public lands and spur greater activity for increasing our domestic reserves." *Id.* at 3314–15.

**C.     Plaintiffs' Challenges to BLM's APD Approvals**

In compliance with its congressional directive to promote development of the Nation's onshore oil and gas resources, BLM "approved at least 4,019 APDs in the Permian and Powder River Basins" of New Mexico and Wyoming between January 21, 2021, and August 31, 2022. Amend. Compl., ¶¶ 102–103; *see also id.*, Appx. A. On June 15, 2022, Plaintiffs Center for Biological Diversity and WildEarth Guardians first challenged the approvals "[d]uring the first

sixteen months of the Biden administration" "of at least 3,535 . . . [APDs] for oil and gas in New Mexico's Permian Basin and Wyoming's Powder River Basin" for alleged violations of NEPA, FLPMA, and the ESA.  Compl. (Dkt. No. 1), ¶¶ 1, 3; *see also id*., Appx. A & B.

After the Federal Defendants filed their answer and several Intervenor-Defendants filed motions to dismiss, Plaintiffs filed their current Amended Complaint for declaratory and injunctive relief challenging the approvals "[d]uring the first twenty months of the Biden administration" of "well over 4,000 APDs in the Permian and Powder River Basins" for alleged violations of NEPA, FLPMA, and the ESA.  Amend. Compl., ¶¶ 1, 3.  The Amended Complaint adds two more Plaintiffs—Citizens Caring for the Future and New Mexico Interfaith Power and Light—and challenges to hundreds of additional APD approvals.  *Id*., ¶¶ 21, 22.  The Amended Complaint does not, however, allege that Plaintiffs participated in any administrative challenges attendant to Federal Defendants' decision-making processes regarding the APD approvals in this lawsuit before filing it.  At most, Plaintiffs allege that, *after* APD approvals were issued and the agency actions were final, Plaintiffs Center for Biological Diversity and WildEarth Guardians "sent a Notice of Intent to Sue . . . alleging violations of the Endangered Species Act including the failure to consult on the approval of APDs with respect to climate-imperiled species and the failure to reinitiate consultations regarding the impacts to climate-imperiled species."  *Id*., ¶ 18.

To remedy the alleged statutory violations, Plaintiffs ask the Court to, among other things, (1) "[d]eclare that Federal Defendants' oil and gas drilling permit authorizations challenged herein violate" NEPA, the ESA, and FLPMA; (2) "[v]acate and set aside Federal Defendants' oil and gas drilling permit authorizations challenged herein"; (3) "[e]njoin Federal Defendants from approving or otherwise taking action to approve any applications for permits to drill on federal public lands

and minerals until Federal Defendants have fully complied with" NEPA, the ESA, and FLPMA;

and (4) "[r]emand this matter to BLM for further action." *Id.*, Requested Relief, ¶¶ A–F.

## LEGAL STANDARDS

Plaintiffs' failure plausibly to allege Article III standing triggers Federal Rule of Civil

Procedure 12(b)(1), and requires dismissal pursuant to Federal Rule of Civil Procedure 12(h)(3).

*See*, *e.g.*, *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 186 (D.D.C. 2022).  Plaintiffs

bear the burden of establishing standing, *Defs. of Wildlife*, 504 U.S. at 561, and it is "presume[d]

that federal courts lack jurisdiction unless the contrary appears affirmatively from the record,"

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quotations omitted).  Upon a

motion to dismiss for lack of standing, "the Court must resolve the motion in a manner similar to

a motion to dismiss under Rule 12(b)(6)."  *Regan*, 597 F. Supp. 3d at 186.  Accordingly, although

a reviewing court accepts the complaint's factual allegations, it does not "accept inferences

unsupported by the facts alleged or legal conclusions that are cast as factual allegations."

*Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp. 2d 187, 193 (D.D.C. 2007) (quotations

omitted).  Because the Court has "an affirmative obligation to ensure that it is acting within the

scope of its jurisdictional authority," *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F.

Supp. 2d 9, 13–14 (D.D.C. 2001), it may "consider[ ] matters outside the pleadings" in addressing

a Rule 12(b)(1) motion without converting it to a motion for summary judgment.  *Ord v. District

of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009).

Plaintiffs' failures to comply with Section 226-2's limitations period, and with issue

exhaustion requirements, trigger Federal Rule of Civil Procedure 12(b)(6), which "tests the legal

sufficiency of a complaint." *Alford v. Providence Hosp.*, 60 F. Supp. 3d 118, 123 (D.D.C. 2014).

Plaintiffs must "state a claim that is plausible on its face" with respect to the challenged APD

approvals.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *see also Jackson v.*

*Modly*, 949 F.3d 763, 767 (D.C. Cir. 2020).  In making this determination, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which the court may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up).[1]

## ARGUMENT

Plaintiffs lack standing to challenge BLM's approval of the challenged APDs because they do not identify members interested in areas with any geographic proximity to any particular APD. Plaintiffs have chosen to lump all four thousand-plus separate APD-approval decisions as a group in their Amended Complaint, but it is not enough for Plaintiffs to assert standing to challenge *some* APDs—although they fail to do even that.  They must plausibly plead standing for *each* APD they seek to vacate, and they have not.  Plaintiffs fail to identify any particularized or concrete injury caused by each challenged APD approval, as opposed to the generalized harms associated with global climate change that all Americans share in common.  Nor do Plaintiffs plausibly explain how the emissions attributable to the challenged APDs materially contribute to the global climate-change harms they assert, or how vacating these APD approval decisions will prevent or alleviate those harms.  Because Plaintiffs have not met their burden to establish standing, the Amended Complaint must be dismissed for lack of jurisdiction.  *See* Fed. R. Civ. Pro. 12(b)(1), (h)(3); *Defs. of Wildlife*, 504 U.S. at 561.

---

[1] Although as required by Federal Rule of Civil Procedure 24(c), Intervenor-Defendants submitted their proposed Answers to the Amended Complaint in conjunction with their motions to intervene, the Court should apply the well-known standards for failure to state a claim pursuant to Rule 12(b)(6) rather than for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c). But regardless of which label is deemed to apply to the instant motion, this Court applies the same standard in assessing the motion.  *See, e.g.*, *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 58 (D.D.C. 2007) ("The appropriate standard for reviewing a motion for judgment on the pleadings is virtually identical to that applied to a motion to dismiss under Rule 12(b)(6)."); *id.* at 60 (explaining that "the court may consider a premature Rule 12(c) motion under Rule 12(b)(6)").

In addition, despite actively litigating against BLM over recent years, Plaintiffs sat on their rights and are therefore barred from challenging the vast majority of the APD approval decisions at issue in this case because they failed to comply with the applicable statute of limitations, and failed to raise their challenges initially before the expert agency charged by Congress with implementing the Nation's oil and gas program consistent with applicable environmental protections.   Plaintiffs' failure to comply with the applicable statute of limitations and administrative exhaustion require dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## I.      Plaintiffs Fail Plausibly To Allege Article III Standing.

Plaintiffs allege that BLM failed to consider global climate change impacts, including impacts on species located thousands of miles from where drilling and exploration are authorized, for every single APD the agency has approved in the last year and a half.  Amend. Compl., ¶¶ 2–3, 102.  But Plaintiffs have not plausibly alleged that they have standing to assert these sweeping claims as to any particular APDs.

Standing is a constitutional prerequisite to the exercise of federal judicial power, and thus constitutes "an essential and unchanging part of the case-or-controversy requirement of Article III." *Defs. of Wildlife*, 504 U.S. at 560.  For a plaintiff to have standing, (1) "there must be alleged (and ultimately proved) an injury in fact—a harm suffered by the plaintiff"; (2) "there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"; and (3) "there must be redressability—a likelihood that the requested relief will redress the alleged injury."  *Steel Co.*, 523 U.S. at 102–03 (quotations omitted).  These requirements apply whether an organization asserts standing to sue on its own behalf or on behalf of its members.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).

Plaintiffs bear the burden of demonstrating Article III standing and must support each element of standing "with the manner and degree of evidence required at [each] successive stage[] of the litigation." *Defs. of Wildlife*, 504 U.S. at 561; *see also Iqbal*, 556 U.S. at 678 (explaining that, at the motion to dismiss stage, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (quotations omitted)). Plaintiffs' Amended Complaint challenges thousands of APDs in one fell swoop. But "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996). Plaintiffs must therefore "demonstrate standing for *each* claim that they press and for *each* form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (emphases added). That is, Plaintiffs must establish standing as to *each* APD approval they seek to vacate; each APD approval is a "discrete regulatory action[] with—importantly—discrete effects." *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020). Because Plaintiffs have failed to establish standing, Article III requires dismissal. *See Defs. of Wildlife*, 504 U.S. at 560.

### A.   Plaintiffs Do Not Plausibly Allege Organizational Standing to Vacate the Challenged APD Decisions.

Organizations suing in their own right, like any individual plaintiff, must "show actual or threatened injury in fact." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). To satisfy the injury-in-fact requirement, an organization must plausibly allege that it has suffered a "concrete and demonstrable injury to [its] activities." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quotations omitted). The D.C. Circuit has repeatedly emphasized that "[c]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161–62 (D.C. Cir. 2005) (quotations omitted), because "frustration of an organization's objectives is the type of abstract concern that does not impart standing," *Food & Water Watch*,

11

808 F.3d at 919 (quotations omitted).  As a result, organizations cannot establish standing by pointing to advocacy expenditures, *see Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015); litigation or investigation expenses, *see Food & Water Watch*, 808 F.3d at 919; or education costs, unless these are "operational costs beyond those normally expended," *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).  A mere "setback to the organization's abstract social interests" is not enough.  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quotations omitted).

Plaintiffs fall far short of plausibly alleging organizational standing under these standards. The Amended Complaint states Plaintiffs' organizational purposes in broad and generic terms: The Center for Biological Diversity cares about "the conservation and recovery of species on the brink of extinction and the habitats they need to survive," Amend. Compl., ¶ 20; WildEarth Guardians cares about "protecting and restoring the wildlife, wild places, wild rivers, and health of the American West," *id.*, ¶ 23; Citizens Caring for the Future "bring[s] together" community members seeking to protect "the air, water and public health and safety," *id.*, ¶ 21; and New Mexico Interfaith Power and Light "works for climate justice," *id.*, ¶ 22.  Plaintiffs insist these "interests will be adversely affected and irreparably injured if Federal Defendants continue to violate NEPA, the ESA, and FLPMA." *Id.*, ¶ 14.  But these are general conflicts with organizational interests that the D.C. Circuit routinely rejects as insufficient.  *See Ctr. for Law & Educ.*, 396 F.3d at 1161–62; *Food & Water Watch*, 808 F.3d at 920–21.

Plaintiffs have not alleged that any deficiencies in BLM's approvals of the challenged APDs have inhibited their "daily operations" so as to constitute actual injury.  *Food & Water Watch*, 808 F.3d at 919 (quotations omitted).  Indeed, the Amended Complaint does not allege that Plaintiffs' organizational activities have been impaired at all by BLM's allegedly procedurally

12

inadequate APD approvals. Plaintiffs therefore have not adequately alleged organizational standing to challenge the APDs. *See Ctr. for Law & Educ.*, 396 F.3d at 1162 n.4 ("[T]o hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate the standing doctrine's actual injury requirement.").

### B.   Plaintiffs Do Not Plausibly Allege Associational Standing to Vacate the Challenged APD Decisions.

Organizations may also sue on behalf of their members if (1) at least one member would have standing to sue in her own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit. *See*, *e.g.*, *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

As in many cases, "the crux of the standing issue" here is whether Plaintiffs' members would have standing to sue in their own right. *Sierra Club v. Perry*, 373 F. Supp. 3d 128, 136 (D.D.C. 2019) (citation omitted). Because Plaintiffs challenge "site-specific agency action[s], each plaintiff association must identify a member affected by each site-specific action." *Friends of The Earth, Bluewater Network Div. v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 16 (D.D.C. 2007). Plaintiffs have not plausibly pleaded that their members—either separately or in combination—have suffered any concrete and particularized harm from the challenged APD decisions, as opposed to generalized public harms associated with global climate change. Nor have Plaintiffs alleged that the harms they assert are traceable to BLM's approval of the APDs or that those harms will be redressed by vacatur of these APD approvals.

1.   **Plaintiffs Do Not Adequately Allege a Cognizable Injury-in-Fact Because They Have Not Identified Any Member With an Interest in Any Particular Challenged APD.**

Plaintiffs' sole identified injury is procedural; they allege that BLM did not fulfill the procedural requirements of its governing statutes.  Amend. Compl., ¶¶ 191–220.  But a procedural violation alone, without concrete harm, is insufficient to create Article III standing.

Although courts somewhat "relax the normal standards of redressability and imminence" when parties allege injury to their procedural rights, *Env't Def. Fund v. FERC*, 2 F.4th 953, 968 (D.C. Cir. 2021) (quotations omitted), *cert. denied sub nom.* S*pire Mo. Inc. v. Env't Def. Fund*, 142 S. Ct. 1668 (2022), "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute," *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *see also Ctr. for Law & Educ.*, 396 F.3d at 1159 ("[T]he procedural-rights plaintiff must still satisfy the general requirements of the constitutional standards of particularized injury.").  A deprivation of a procedural right "without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Summers*, 555 U.S. at 496.  As a result, "omission of a procedural requirement does not, by itself, give a party standing to sue."  *Food & Water Watch*, 808 F.3d at 921 (quoting *Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009)); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) ("An interest shared generally with the public at large in the proper application of the Constitution and laws will not do.").

Plaintiffs must therefore establish "some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing."  *Nat'l Ass'n of Home Builders*, 667 F.3d at 15; *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667 n.4 (D.C. Cir. 1996) (en banc) (Plaintiffs "must show that [they are] . . . not simply injured as is everyone else, lest the injury be too general for court action, and suited instead for political redress.").  In making

14

that connection, Plaintiffs must allege that "at least one specifically-identified member has suffered an injury-in-fact." *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815, 820 (D.C. Cir. 2006).   Plaintiffs have tried to do so by identifying members with alleged harms to their "recreational and aesthetic pursuits" resulting from the effects of climate change.   Amend. Compl., ¶ 30, *see also id.*, ¶¶ 24, 28–32, 34.   Although harms to recreational and aesthetic interests can constitute a concrete injury, *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019) ("In environmental cases, courts must carefully distinguish between injury to the [plaintiff] and injury to the environment."), Plaintiffs must allege harm to those interests "which has occurred or is imminent due to **geographic proximity** to the action challenged," *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002) (emphasis added).   In other words, Plaintiffs must identify "some specific risk of environmental harm" that "imperil[s]" the members' "particularized interests" in a species or habitat with which the members share a "geographic nexus." *Fla. Audubon Soc'y*, 94 F.3d at 666–68; *see also Summers*, 555 U.S. at 499 ("to establish standing, [] plaintiffs must show that they 'use the area affected by the challenged activity and not an area roughly in the vicinity of' the activity" (quoting *Defs. of Wildlife*, 504 U.S. at 566)); *Bluewater Network Div.*, 478 F. Supp. 2d at 21 ("where site-specific agency action is involved, . . . standing must be established as to specific locations").[2]

---

[2] Some of Plaintiffs' members also profess "concern[s] for the health of the elderly" and "harms to children's health." Am. Compl., ¶¶ 26–27. But "Article III standing is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (cleaned up). Because the health concerns of other, unnamed people is not an injury that affects any Plaintiff "in a personal and individual way," those concerns cannot confer standing, *Defs. of Wildlife*, 504 U.S. at 560 n.1. One named member, Kayley Shoup, asserts her own health concerns, Amend. Compl., ¶ 26, but does not identify any challenged APD anywhere near her whose approval will allegedly exacerbate her health conditions.

But none of Plaintiffs' identified members claims any proximity to the wells or operations associated with any challenged APD.  Start with the most obvious:  Many of Plaintiffs' identified members "assert[] absolutely no particularized connection to or interest in" the Permian Basin or Powder River Basin—let alone the same state or continent.  *Appalachian Voices v. Bodman*, 587 F. Supp. 2d 79, 86 (D.D.C. 2008); *see* Amend. Compl., ¶ 29 (identifying members with interests in habitats in Arizona, Florida, California, Hawaii, the Arctic, and the ocean).  Such far-flung interests cannot support associational standing because there is no "geographic nexus between the individual asserting the claim and the location suffering an environmental impact."  *Appalachian Voices*, 587 F. Supp. 2d at 85 (quotations omitted); *see also Defs. of Wildlife*, 504 U.S. at 572 n.7 (rejecting "standing for persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the [challenged] dam"); *Fla. Audubon Soc'y*, 94 F.3d at 667–68 (no standing to challenge federal tax credit incentivizing ethanol production where plaintiff organization identified only a "general risk" of harm, without a "geographic nexus" connecting members to "particular areas" harmed by the tax credit); *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1020 (9th Cir. 2021) ("That none of the [Plaintiffs] actually live [or recreate] in Texas underscores their lack of standing."), *cert. denied*, 142 S. Ct. 713 (2021).

Plaintiffs' remaining named members, who at least profess some interest in either the Permian Basin or Powder River Basin generally, do not fare much better.  To allege standing, Plaintiffs must "identify 'specific areas' of the [Permian or Powder River] Basin that they personally use in which development would harm their interests."  *Pub. Emps. for Env't Resp. v. Bernhardt*, No. 18-cv-1547, 2020 WL 601783, at *6 (D.D.C. Feb. 7, 2020).  But none of these identified members say which areas directly affected by development or which of the challenged

APDs they live or recreate near. *See* Amend. Compl., ¶¶ 20–34. Plaintiffs' sole identified member to support standing to challenge the Powder River Basin APDs, Jeremy Nichols, apparently recreates on unspecified "public lands in the Powder River Basin, including areas directly impacted by development of many of the challenged APDs." *Id.*, ¶ 30; *see also MEIC v. Haaland*, No. 19-cv-130, 2022 WL 4592071, at *5 (D. Mont. Sept. 30, 2022) (rejecting Jeremy Nichols' allegations of recreational interest in southeast Montana as sufficient basis to establish standing because "the region of southeast Montana is vast"). Nichols does not identify which of the Powder River Basin APDs he recreates near, and Plaintiffs identify no other member with any interest in the Powder River Basin.

Likewise, for the Permian Basin, Plaintiffs merely list members with complaints about gas development generally, without correlating any of those complaints to the specific APDs challenged here. Amend. Compl., ¶¶ 27–28. Plaintiffs "make little to no effort to show that their members' . . . activities take place" in proximity to challenged APDs, and "do not even identify" a particular APD approval. *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 13–14 (D.D.C. 2016); *see also Appalachian Voices*, 587 F. Supp. 2d at 86 (granting motion to dismiss because plaintiffs "asserted absolutely no particularized connection to or interest in . . . two undisclosed locations"); *City of Scottsdale, Ariz. v. FAA*, 37 F.4th 678, 679 (D.C. Cir. 2022) (city lacked standing to challenge flight paths where it did not "refer to any specific flight that causes specific harm to specific property").

Vague and conclusory allegations that a few members might live or recreate generally in the Powder River Basin or Permian Basin are not enough for this Court to "assure itself that" Plaintiffs' members "plan to make use of the ***specific sites***" where environmental effects will allegedly be felt. *Summers*, 555 U.S. at 499 (emphasis added). Plaintiffs cannot establish standing

to challenge particular APDs by speculating that some members might "use[ ] unspecified portions of an immense tract of territory," on some portion of which oil-and-gas development by some unnamed party "has occurred or probably will occur by virtue of the governmental action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *see also Summers*, 555 U.S. at 496 (refusing "to assume" that member "will stumble across a project tract unlawfully subject to the [challenged] regulations" or that "the tract is about to be developed . . . in a way that harms his recreational interests"). Plaintiffs "cannot simply assert some interest somewhere within a large geographic area," *Ctr. for Biological Diversity*, 937 F.3d at 538, because Plaintiffs asserting "injury from environmental damage must use the area affected by the challenged activity and not an area roughly in the vicinity of it," *Defs. of Wildlife*, 504 U.S. at 565–66 (internal quotation marks omitted).

The *National Wildlife Federation* Court rejected standing based on assertions that environmental-group members used land somewhere "in the vicinity" of the 5.5 million acres making up the Arizona Strip. 497 U.S. at 886. The Permian Basin covers more than sixty million acres—roughly 93,000 square miles—across New Mexico and Texas; the Powder River Basin covers nearly thirty million acres—roughly 46,000 square miles—across Wyoming and Montana.[3] Reflexively naming an interest in the entire Permian Basin or the entire Powder River Basin is no more permissible than naming an interest in the entire Atchafalaya Basin, *Pub. Emps. for Env't Resp.*, 2020 WL 601783, at *6 ("These sorts of broad, general assertions will not suffice: the Basin is a massive 1.2 million–acre area . . . ."), or Yellowstone National Park. *San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*, 257 F. Supp. 2d 133, 140 n.6 (D.D.C. 2003)

---

[3] *See* U.S. Energy Information Administration, *"New petroleum technology revitalizes Powder River Basin oil production,"* Today In Energy, (Sept. 15, 2014), https://www.eia.gov/todayinenergy/detail.php?id=17971 (last visited Jan. 17, 2023).

("[T]he 'immense tracts of territory' represented by Yellowstone National Park and the four states renders problematic the plaintiffs' claim of standing.").   Other courts have likewise rejected standing where plaintiffs claimed general interests in enormous regions.   *See, e.g.*, *Ctr. for Biological Diversity*, 937 F.3d at 539 ("A geographic area as big as the 'Western and Central portions of the Gulf [of Mexico]' cannot support Article III standing."); *Pollack v. United States Dep't of Just.*, 577 F.3d 736, 742 (7th Cir. 2009) (no standing where plaintiff claimed general interest in the "Great Lakes watershed" and public parks "along the Illinois portion of Lake Michigan" (quotations omitted)); *Heartwood, Inc. v. Agpaoa*, 628 F.3d 261, 267 (6th Cir. 2010) (same, for 25,000 acres of forest).

Accepting such alleged general interests in a large geographic area "as adequate to confer standing to challenge any Government action affecting any portion" of that area—here, approved APDs for particular lease parcels—"would be tantamount to eliminating the requirement of concrete, particularized injury in fact." *Summers*, 555 U.S. at 496.  And "[w]ithout a geographic nexus, [Plaintiffs'] members cannot suffer an injury in fact." *Ctr. for Biological Diversity*, 937 F.3d at 538; *see also Fla. Audubon Soc'y*, 94 F.3d at 668 ("Because appellants have not demonstrated such a geographic nexus to any asserted environmental injury, we cannot hold that they have standing to sue.").[4]

To the extent Plaintiffs more broadly suggest their identified members with interests in lands hundreds or thousands of miles away from any particular APD have suffered an injury in

---

[4] To the extent that the declarants fear harm from previously approved drilling operations in the Powder River Basin, *see* Amend. Compl., ¶ 30 ("Oil and gas development has a negative impact on the relatively undeveloped landscapes particularly enjoyed by Mr. Nichols."), such already-existing injury cannot support the present APD challenges.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012).

19

fact because their interests are "imperiled" by the APD approvals collectively "exacerbat[ing]" climate change," Amend. Compl., ¶¶ 29, 32, 34, the Supreme Court has already rejected similar arguments. The Court has rejected, for instance, an "ecosystem theory," where "any person who uses any part of a 'contiguous ecosystem' adversely affected by a funded activity has standing even if the activity is located a great distance away." *Defs. of Wildlife*, 504 U.S. at 565 (emphasis omitted). The Court has also rejected an " 'animal nexus' approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing," and a " ' vocational nexus' approach, under which anyone with a professional interest in such animals can sue." *Id.* at 566. Arguments about harm related to climate change share the same deficiencies. As the D.C. Circuit has explained, "climate change is a harm that is shared by humanity at large, and the redress that [Plaintiffs] seek—to prevent an increase in global temperature—is not focused any more on these [Plaintiffs] than it is on the remainder of the world's population." *Ctr. for Biological Diversity*, 563 F.3d at 478; *see also Berka v. Nuclear Regul. Comm'n*, No. 21-1134, 2022 WL 412470, at *1 (D.C. Cir. Feb. 3, 2022) (an "asserted injury based on climate change is not a particularized injury").

Plaintiffs' members might well be concerned about global climate change, but that does not mean they have suffered an injury in fact. "The procedural-rights nature of a case 'does not—and cannot—eliminate any of the irreducible elements of standing.' " *San Juan Audubon Soc'y*, 257 F. Supp. 2d at 141 n.8 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664). Nor can Plaintiffs fall back on generalized allegations that some other unidentified members of their national organizations "use and enjoy . . . lands in New Mexico and Wyoming that are in and adjacent to the oil and gas well sites that are the subject of th[eir] Amended Complaint." Amend. Compl., ¶¶ 24–25, 31. Again, "it is not enough to aver that unidentified members have been injured."

20

*Chamber of Com. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011). Indeed, the Supreme Court in *Summers* rejected a theory of standing based on the interests of unnamed members of plaintiff environmental organizations. The Sierra Club had asserted that it was "probable" that at least some of its 700,000 members "have planned to visit some (unidentified) small parcels affected by the Forest Service's procedures and will suffer (unidentified) concrete harm as a result." *Summers*, 555 U.S. at 497–98. The Supreme Court rejected that conjectural theory of standing, explaining that accepting it "would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 497.

The same is true here. Like in *Summers*, accepting Plaintiffs' broad allegations that some unidentified members use "public lands in New Mexico and Wyoming that will be affected by the drilling permits challenged," Amend. Compl., ¶ 20, *see also id.*, ¶¶ 23, 24, 31, as adequate to confer standing to challenge BLM's approval of APDs "would be tantamount to eliminating the requirement of concrete, particularized injury in fact." *Summers*, 555 U.S. at 496.

In short, Plaintiffs cannot establish standing to challenge APD approvals across the entire Permian Basin or Powder River Basin—let alone any particular APDs—without correlating their members' asserted interests in particular areas with particular APDs. Plaintiffs' alleged interests here in some unspecified portion of vast tracts of land, unconnected to any allegation about proximity to particular challenged APDs, are simply "too generalized to establish standing." *Ctr. for Biological Diversity*, 563 F.3d at 478. Plaintiffs instead "must show that actual, ***site-specific activities*** are diminishing or threaten to diminish their members' enjoyment." *Ctr. for Biological Diversity v. Lueckel*, 417 F.3d 532, 537 (6th Cir. 2005) (emphasis added). Because

they have not done so, Plaintiffs' members lack standing.  And because Plaintiffs' members do not have standing in their own right, Plaintiffs cannot assert associational standing on their behalf.

2.    **Plaintiffs Fail Plausibly to Allege Traceability and Redressability.**

Plaintiffs also fail to establish Article III standing because they do not plausibly plead that any of their members' claimed injuries are fairly traceable to the challenged APD decisions and are redressable by a judgment vacating them.

Start with traceability.  Plaintiffs must adequately allege that there is a "causal connection between" their members' claimed "injur[ies] and the conduct complained of—the injur[ies] must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  Thus, even in procedural-injury cases, the Supreme Court "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc'y*, 94 F.3d at 664.  For that reason, where, as here, the plaintiff "is not the object of" the challenged "government action or inaction, 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *Ctr. for Biological Diversity*, 563 F.3d at 477 (quoting *Defs. of Wildlife*, 504 U.S. at 562).

In procedural-injury cases, an adequate causal chain contains two links.  The first link "connect[s] the omitted [analysis] to some substantive government decision that may have been wrongly decided because of the lack of [proper analysis] and one connecting that substantive decision to the plaintiff's particularized injury." *Fla. Audubon Soc'y*, 94 F.3d at 668.  The second link requires a "causal connection between the agency action and the alleged injury," *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007), meaning that Plaintiffs must demonstrate a "substantial probability" that the agency action will adversely affect local conditions

and thus harm one of their members, *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) (quotations omitted).

Plaintiffs omit the second link. Plaintiffs never explain how their alleged harms from the challenged APD decisions (let alone any particular challenged APD), as opposed to any other source of greenhouse gases, cause the climate harms that they allege. After all, the challenged APDs are an infinitesimal source of greenhouse gases in the greater scheme of global emissions. And as Plaintiffs put it, it is "increasing greenhouse gas emissions" as a whole that will lead to harmful climate change. *See* Amend. Compl., ¶ 5. Plaintiffs' failure plausibly to allege that emissions caused by BLM's approval of the challenged APDs will make a meaningful difference within the broader scope of climate change means that the recreational and aesthetic harms that Plaintiffs' members allege will occur with or without the challenged APDs. *See id.*, ¶ 29; *City of Olmsted Falls*, 292 F.3d at 267 ("[G]eographic proximity does not, in and of itself, confer standing on any entity under NEPA or any other statute" because "it is the concrete and particularized injury which has occurred or is imminent due to geographic proximity to the action challenged that gives rise to Article III standing."). And even if Plaintiffs had identified some alleged injury resulting from any of the tens of thousands of wells in the Permian Basin and the Powder River Basin, Plaintiffs have made no attempt to trace it to the more than 4,000 individual wells challenged here—let alone any particular well. *See Bluewater Network Div.*, 478 F. Supp. 2d at 19 ("[T]he most plaintiffs have done is to supply the Court with a list of park units a member has visited," but that "fail[s] to link any injury to any park unit, let alone a unit at issue in [the complaint].").

To be sure, traceability "does not require that the 'challenged action must be the 'sole' or 'proximate' cause of the harm suffered, or even that the action must constitute a 'but-for cause' of the injury." *Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 73 (D.D.C. 2009)

(citation omitted).  But Plaintiffs must still plausibly allege a "substantial probability" that BLM's approval of the challenged APDs "will cause the alleged injury-in-fact" and that "local conditions will be adversely affected." *City of Waukesha v. EPA*, 320 F.3d 228, 236 (D.C. Cir. 2003) (per curiam) (second quoting *Sierra Club*, 292 F.3d at 898).  Plaintiffs have not plausibly done so; they have not explained how it is "substantially probable" that the emissions attributable to the challenged APDs "created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff[s]." *Env't Def. Fund*, 2 F.4th at 968 (citation omitted).  Plaintiffs "cannot 'substitute speculation for substantial probability, and hope that doing so will carry them across the causation bridge.'" *E. Band of Cherokee Indians v. U.S. Dep't of Interior*, 534 F. Supp. 3d 86, 115 (D.D.C. 2021) (quoting *San Juan Audubon Soc'y*, 257 F. Supp. 2d at 141), *appeal dismissed*, 2022 WL 102544 (D.C. Cir. Jan. 5, 2022).

Plaintiffs' claims do not satisfy the traceability test for a second reason.  The climate change impacts they allege are largely due to the conduct of third parties whose actions BLM does not control. *See Bennett*, 520 U.S. at 167.  The D.C. Circuit has explained that climate change standing arguments like Plaintiffs' "rely on too tenuous a causal link" by assuming that "drilling . . . will bring about more oil; this oil will be consumed; the consumption of this oil will result in additional carbon dioxide being dispersed into the air; this carbon dioxide will consequently cause climate change; this climate change will adversely affect the animals and their habitat; therefore [Plaintiffs] are injured by the adverse effects on the animals they enjoy." *Ctr. for Biological Diversity*, 563 F.3d at 478–79.  "Such a causal chain cannot adequately establish causation because [Plaintiffs] rely on the speculation that various different groups of actors not present in this case—namely, oil companies, individuals using oil in their cars, cars actually dispersing carbon dioxide—might act in a certain way in the future." *Id*. at 479.

24

Finally, Plaintiffs fail the redressability test.  Plaintiffs have not plausibly alleged that a judgment vacating the challenged APDs would redress the climate-change harms that their members assert, particularly where Plaintiffs have raised no objection to the tens of thousands of existing wells operating in the Permian Basin and the Powder River Basin.  *See* Amend. Compl., ¶ 137 (conceding that BLM managed nearly 100,000 "active producible wells" before the time period challenged here); *id*., ¶ 146 (alleging that the Powder River Basin "has become a site of considerable oil and gas production"); *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 65 (D.C. Cir. 2000) (per curiam) (no standing when plaintiffs fail to link the perceived harm to the specific activity under challenge as opposed to other activities), *as amended* (Aug. 18, 2000).  Indeed, this Court has held that environmental plaintiffs lack standing when their alleged harms are tied to existing "projects that will remain unchanged by any correction of procedural errors," *Nat'l Wildlife Fed'n*, 170 F. Supp. 3d at 16, as have other courts, *see*, *e.g.*, *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 971 (6th Cir. 2009) (group lacked standing to bring NEPA claim alleging ongoing harm to members' aesthetic and recreational enjoyment of reservoir where suit did not seek remedial measures to counteract or prevent harms allegedly caused by existing docks); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1102 (9th Cir. 2007) (same, where construction of wastewater facility had already been completed).  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

*       *       *

Plaintiffs' members accordingly fail all three prongs of the Article III standing inquiry. That, in turn, means that Plaintiffs cannot assert associational standing on their behalf.  *See Nat'l Ass'n of Home Builders*, 667 F.3d at 12, 16 (affirming district court's dismissal for lack of standing

where trade association had established neither organizational standing nor that any of its members had standing in their own right).  Taken both together and individually, the Amended Complaint should be dismissed.  *See Steel Co.*, 523 U.S. at 94 ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868))).

## II.     The MLA's Statute Of Limitations Bars Plaintiffs' Challenges To At Least 3,869 Of The APD Approvals.

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress."  *Block v. N. Dakota ex rel. Bd. Of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983).  "A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied."  *Id*.  These conditions include statutes of limitations.  *See id*.

Plaintiffs' challenges to at least 3,869 of the APD approval decisions at issue are barred by Section 226-2's 90-day limitations period created by Congress as part of its MLA amendments designed to remove "obstacles" to oil and gas development.  *See* 1960 U.S.C.C.A.N. at 3314–15. As detailed below, the Complaint and Amended Complaint make clear that at least 3,869 of Plaintiffs' APD decision challenges are barred by Section 226-2.

### A.     Section 226-2's Specific Statute of Limitations Applies to All of Plaintiffs' Causes of Action.

While Plaintiffs allege that Federal Defendants' challenged APD approval decisions violate both FLPMA and NEPA, *see supra*, neither statute provides an independent cause of action. *See, e.g.*, *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 177 (D.C. Cir. 2019) (NEPA); *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998) (FLPMA).  Rather, the APA supplies Plaintiffs' cause of action with respect to these statutes.  *See, e.g.*, *Gov't of Manitoba*, 923 F.3d at 177 ("[A]ny

challenge to agency action based on NEPA must be brought under the Administrative Procedure Act . . . ."); *Babbitt*, 137 F.3d at 1203.  In other words, by challenging Federal Defendants' APD approval decisions under NEPA and FLPMA, Plaintiffs invoke the limited waiver of sovereign immunity provided by the APA.  *See*, *e.g.*, *Nat'l Wildlife Fed'n*, 497 U.S. at 882; *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 507.

In the absence of a specific statute of limitations, APA claims "are subject to the statute of limitations contained in 28 U.S.C. § 2401," which generally allows for claims against the United States filed within six years of accrual.  *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014). Plaintiffs' claims that the challenged APD approval decisions also violate the ESA, 16 U.S.C. § 1540(g)(1), are likewise subject to "the general six-year statute of limitations set forth in 28 U.S.C. § 2401(a)," absent a specific statute of limitations.  *Ctr. for Biological Diversity v. U.S. EPA*, 847 F.3d 1075, 1087 (9th Cir. 2017).

But the general six-year statute of limitations yields to a more specific limitations period because the APA does not "affect[] other limitations on judicial review."  5 U.S.C. § 702(1).  As the *Attorney General's Manual on the Administrative Procedure Act* ("*APA Manual*") explains, "the time within which review must be sought" for a cause of action under the APA "will be governed, as in the past, by relevant statutory provisions," and "the general principles stated in [the APA's judicial review provisions] must be carefully coordinated with existing statutory provisions and case law."[5]

---

[5]     *APA Manual* at 98, *available at* https://archive.org/details/AttorneyGeneralsManualOnTheAdministrativeProcedureActOf1947 (last visited Jan. 17, 2023).  The Supreme Court has long found the *APA Manual* to be "persuasive" in interpreting the APA.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004).

The remainder of Plaintiffs' claims allege violations of the ESA, which are likewise subject to the specific limitations period set forth in the underlying substantive statute: the MLA's 90-day limitations period.  *See Ctr. for Biological Diversity*, 847 F.3d at 1087 (citing, *inter alia*, *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937 (9th Cir. 2006), and *Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986)); *see also Ctr. for Biological Diversity*, 847 F.3d at 1087 (noting that procedural ESA claims are generally subject to the default six-year limitations period set forth in 28 U.S.C. § 2401(a)).

A specific statute of limitations superseding more general limitations periods—such as 28 U.S.C. § 2401—that are otherwise applicable to Plaintiffs' claims is a fundamental concept consistent with the "commonplace [canon] of statutory construction that the specific governs the general."  *Howard v. Pritzker*, 775 F.3d 430, 438 (D.C. Cir. 2015) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).  "This is no less true with respect to statutes of limitations."  *Id.*; *see also, e.g.*, *Kannikal v. Att'y Gen. United States*, 776 F.3d 146, 155 (3rd Cir, 2015) ("Section 2401(a) is meant to apply when other limitations periods are lacking . . . ."); *Nagahi v. INS*, 219 F.3d 1166, 1171 (10th Cir. 2000) ("***In the absence of a specific statutory limitations period***, a civil action against the United States under the APA is subject to the six-year limitations period found in 28 U.S.C. § 2401(a)." (emphasis added)); *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245 (10th Cir. 2012) (APA "prohibits review of agency decisions 'to the extent that . . . statutes preclude judicial review.'" (quoting 5 U.S.C. § 701(a))).

"The MLA includes such a [specific] prohibition."  *Impact Energy Res.*, 693 F.3d at 1245. Section 226-2 provides:

> No action contesting ***a decision*** of the Secretary ***involving any oil and gas lease*** shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary ***relating to*** such matter.

30 U.S.C. § 226-2 (emphases added).  This statutory deadline constitutes "a condition to the waiver of sovereign immunity and thus must be strictly construed."  *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990).  The plain language, legislative history, and congressional purpose make clear that Section 226-2's 90-day limitations period applies to bar Plaintiffs' challenges to the vast majority of Federal Defendants' APD approval decisions.

Construction of Section 226-2 "begin[s] . . . with the plain language of the statute."  *AT&T Inc. v. FCC*, 452 F.3d 830, 835 (D.C. Cir. 2006) (quotations omitted).  That language is broad.  First, the term "'involving' is broad and indeed the functional equivalent of 'affecting.'"  *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 273–74 (1995).  Second, "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).  Finally, the phrase "relating to" is "a broad one" that means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association or connection with."  *Morales*, 504 U.S. at 383 (quotations omitted).  In short, where a party files an action contesting a decision of the Secretary "involving" at least one oil and gas lease, Congress limited such claims to those filed within 90 days of the decision.

The legislative history confirms that Section 226-2 broadly bars challenges filed more than 90 days after a final decision involving an oil and gas lease.  The Conference Committee that drafted the final version of Section 226-2 "accepted the principle of the Senate language" on the statute of limitations.  1960 U.S.C.C.A.N. 3313, 3337.  That language was meant to enact a "statute of limitations providing that ***any action under the Administrative Procedure Act*** to review a decision of the Secretary involving an oil and gas lease must be initiated within 90 days after the final decision of the Secretary."  *Id*. at 3317 (emphasis added).  More broadly, the 1960 MLA

29

amendments as a whole were designed to remove "obstacles" to oil and gas exploration and development, "and spur greater activity for increasing our domestic reserves." *Id*. at 3314–15.[6]

Here, Plaintiffs challenge Federal Defendants' decisions "involving any oil and gas lease." 30 U.S.C. § 226-2.  Their challenge relates to environmental analyses performed—or analyses allegedly not performed—solely for purposes of Secretarial decisions regarding the conduct of oil and gas exploration and development operations on issued oil and gas leases, and thus plainly "involve" and "relate to" oil and gas decisions.  Indeed, the Amended Complaint expressly challenges Federal Defendants' "decisions," *see, e.g.*, Amend. Compl., ¶ 14, to authorize oil and gas exploration and development operations by approving APDs on federal leases, and expressly asks the Court to "[v]acate and set aside Federal Defendants' oil and gas drilling permit authorizations challenged herein."  *Id*., Requested Relief, ¶ D.  The Amended Complaint further sets out the Federal Defendants' dates of decision for each challenged action.  *See id*., Appx. A.

This lawsuit is therefore an "action contesting a decision of the Secretary involving any oil and gas lease," and is thus subject to Section 226-2's 90-day statute of limitations.

Applying the MLA to all of Plaintiffs' claims not only carries out Section 226-2's plain language; it is the only way to effectuate Congress's stated intention to remove "obstacles" to oil and gas exploration and development, "and spur greater activity for increasing our domestic reserves."  1960 U.S.C.C.A.N. at 3314–15.  Allowing claims to be pursued under any of the statutes relied upon by Plaintiffs beyond the prescribed 90-day limitations period would create the precise "obstacles" that Congress intended to avoid.  Limiting the applicability of the statute of

---

[6] A conference committee report is entitled to "great weight" in assessing congressional intent. *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv. of Am., Inc.*, 462 U.S. 810, 833 n.28 (1983); *see also*, *e.g.*, *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981) ("Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent.").

limitations to claims arising only under the MLA itself, and thus allowing other claims to be brought as long as six years after the operative federal authorization, for the stated purpose of obtaining an order "vacat[ing] and set[ting]aside Federal Defendants' oil and gas drilling permit authorizations challenged herein," Amend. Compl., Request for Relief, ¶ D, cannot be reconciled with congressional intent.

Because 3,758 of the Federal Defendants' decisions to approve APDs for operations on federal oil and gas leases were issued more than 90 days before Plaintiffs challenged those approvals in their June 15, 2022 Complaint, Section 226-2 bars Plaintiffs' challenges to those APD decisions.  *See*, *e.g.*, *Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*, 143 F. Supp. 2d 19, 24–25 (D.D.C. 2001) (statute of limitations began to run on the date agency decided to prepare the Supplemental Environmental Impact Statement plaintiffs challenged); Exhibit A (listing challenged APD approval decisions issued before March 17, 2022 according to Complaint Appendices A and B).  Likewise, Section 226-2 bars Plaintiffs' challenges to 111 of the 509 additional APDs included in Plaintiffs' Amended Complaint because those approvals issued more than 90 days before Plaintiffs filed their September 12, 2022, Amended Complaint.  *See* Exhibit B (listing additional challenged APD approval decisions issued before June 14, 2022, according to Amended Complaint Appendix A).  In total, Section 226-2 bars Plaintiffs' challenges to 3,869 of Federal Defendants' APD approval decisions.

Plaintiffs' challenges to these 3,869 APDs should therefore be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *See*, e.g., *Jackson*, 949 F.3d at 767, 776–79.

**B.      NEPA (and the Other Relied-Upon Statutes) Do Not Salvage Plaintiffs' Time- Barred Challenges.**

That Plaintiffs allege procedural violations of NEPA does not alter application of Section

226-2.  Rather, federal courts—including this Court—regularly apply to NEPA claims-specific

statutes of limitations that are shorter than the default six-year limitations period for APA claims

under 28 U.S.C. § 2401(a).  *See, e.g.*, *Miami Bldg. & Constr. Trades Council*, 143 F. Supp. 2d at

24–25 (NEPA challenge to disposition of former Air Force base property barred pursuant to sixty-

day limitation period in Defense Base Closure and Realignment Act); *Nuclear Info. & Res. Serv.*

*v. U.S. Dep't of Transp.*, 457 F.3d 956, 958, 962 (9th Cir. 2006) (sixty-day limitations period in

28 U.S.C. § 2344 barred NEPA challenges to agency regulations); *New Jersey Dep't of Env't Prot.*

*& Energy v. Long Island Power Auth.*, 30 F.3d 403, 405–06, 410,  414 (3d Cir. 1994) (explaining

that 28 U.S.C. § 2344's sixty-day limitation period would bar petition for review of agency order);

*Goos v. Interstate Com. Comm'n*, 911 F.2d 1283, 1288–89 (8th Cir. 1990) (applying sixty-day

limitations period of 28 U.S.C. § 2344 to bar petitioners' NEPA claims).

These decisions are consistent with the similar rule that exclusive jurisdictional provisions

restricting certain lawsuits to the Courts of Appeals equally apply to NEPA claims and supersede

the general federal-question jurisdiction conferred on district courts by 28 U.S.C. § 1331.  *See,*

*e.g.*, *Edwardsen v. U.S. Dep't of the Interior*, 268 F.3d 781, 784 (9th Cir. 2001) ("Because the

alleged NEPA violation arises under [the Outer Continental Shelf Lands Act ("OCSLA")], which

provides for exclusive jurisdiction in the court of appeals, we have original jurisdiction over the

NEPA claim."); *City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979) ("[W]e disagree

that the district court may exercise concurrent jurisdiction merely because a violation of NEPA is

alleged.  The allegation may be raised directly in the courts of appeals; and insofar as it may affect the lawfulness of a directly appealable order we think it must be.").[7]

Again, NEPA's procedural mandates do not negate the "commonplace of statutory construction that the specific governs the general."  *Howard*, 775 F.3d at 438 (quotations omitted); *see also Nuclear Info. & Res. Serv.*, 457 F.3d at 959 ("[W]here a federal statute provides for direct review of an agency action in the court of appeals, such specific grants of exclusive jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts." (quotations omitted)); *Calif. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911–12 (9th Cir. 1989) (explaining that "specific jurisdictional provisions" "control over the general and widely applicable procedures"); *Media Access Project v. FCC*, 883 F.2d 1063, 1067 (D.C. Cir. 1989) ("The courts uniformly hold that statutory review in the agency's specially designated forum prevails over general federal question jurisdiction in the district courts."); *Geertson Farms, Inc. v. Johanns*, 439 F. Supp. 2d 1012, 1020 (N.D. Cal. 2006) (explaining that "courts regularly hold that a challenge to the procedure of an agency action is tantamount to challenging the action itself"); *cf. Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684 (D.C. Cir. 2004) ("When an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court." (internal quotations and citation omitted)).

---

[7] Exercise of exclusive jurisdiction over NEPA claims by the D.C. Circuit is common for challenges to the Department of Interior's five-year leasing programs under OCSLA.  *See, e.g.*, *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015) (asserting OCSLA and NEPA violations); *Ctr. for Biological Diversity*, 563 F.3d at 471–72 (asserting NEPA, APA and other violations); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) (same); *California v. Watt*, 712 F.2d 584 (D.C. Cir. 1983) (asserting NEPA and other violations); *California v. Watt*, 668 F.2d 1290 (D.C. Cir. 1981) (asserting NEPA, APA and other violations).

The Ninth Circuit's application of a specific statute of limitations to environmental claims in *Turtle Island Restoration Network v. United States Department of Commerce*, 438 F.3d 937 (9th Cir. 2006), is instructive.  In that case, environmental groups contended that a regulation issued pursuant to the Magnuson-Stevens Fisheries Act violated NEPA, the ESA, and other statutes.  *See id.* at 942.  While the environmental groups contended that their claims were subject to the general six-year limitations period of 28 U.S.C. § 2401(a) that applies to APA and ESA claims, the Government argued that the plaintiffs' claims were barred by the Magnuson Act's specific thirty-day limitations period for challenges to "[r]egulations promulgated by the Secretary" of Commerce under the Magnuson Act.  *Turtle Island*, 438 F.3d at 940 (quoting 16 U.S.C. § 1855(f)); *see also id.* at 942–43.

The Ninth Circuit concluded that the "plain language" of the Magnuson Act settled the dispute by broadly applying to any challenges to regulations promulgated pursuant to that Act. *See id.* at 943–44.  In short, "the decisive question [wa]s whether the regulations are being attacked, not whether the complaint specifically asserts a violation of the Magnuson Act."  *Id.* at 945.  And because the fisheries reopening that the environmental groups challenged "came about as a result of" a Magnuson Act regulation, *id.* at 944, the Magnuson Act's limitations period applied to bar the plaintiffs' claims, *id.* at 949.  The plaintiffs could not escape that result "through careful[ly] pleading" their complaint as a NEPA challenge.  *Id.* at 945 (citation omitted).  The environmental groups' ESA claim was likewise time-barred by the Magnuson Act's thirty-day limitations period, given that it was "premised on the issuance of regulations reopening the fishery."  *Id.*

The Ninth Circuit's analysis mirrors the application of Section 226-2 here.  The "decisive question" is whether the Secretary's decisions to approve the APDs "are being attacked, not whether the complaint specifically asserts a violation of the [Mineral Leasing Act]."  *Id.*  As in

34

*Turtle Island*, the language of Section 226-2 is "clear and uncomplicated." *Id*. at 943. *See supra* pp. 28–29. And just as the challenge in *Turtle Island* was aimed at the Magnuson Act regulation, Plaintiffs' complaint is "directed at" (*Turtle Island*, 438 F.3d at 945) Federal Defendants' challenged "decisions" (Amend Compl., ¶ 14) to approve APDs and asks this Court to, among other things, "[d]eclare that Federal Defendants' oil and gas drilling permit authorizations . . . violate NEPA," *id*., Relief Requested, ¶ A. Plaintiffs likewise cannot avoid the MLA's 90-day "limitation through manipulation of form—avoiding mention of the [MLA] in the complaint— while in substance challenging" the lease-related decisions. *Turtle Island*, 438 F.3d at 945. Further, the MLA limitations period effectuates "Congress's intent to ensure" expeditious leasing and exploration of public lands for oil and gas development "and that challenges are resolved swiftly." *Id*. at 948; *see also supra* p. 6. Consistent with the reasoning in *Turtle Island* and the broad language of Section 226-2, Plaintiffs' NEPA and other claims are likewise barred.

Although the Tenth Circuit declined to apply Section 226-2's broad provisions to NEPA claims in *Park County Resource Council, Inc. v. United States Department of Agriculture*, 817 F.2d 609 (10th Cir. 1987), *overruled in part by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992), that 35-year-old decision from a different Circuit is neither controlling nor persuasive here. Indeed, it was sharply criticized by the Ninth Circuit in *Turtle Island*. In rejecting application of Section 226-2, *Park County* relied on the Ninth Circuit's earlier decision in *Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986), and the twin assumptions that (1) no statute of limitations (or the APA) applies to NEPA claims, and (2) all NEPA claims must be subject to a uniform limitations period. Each of these underlying bases was misplaced and have been further undermined during the intervening years.

First, *Park County* relied on a purported distinction in *Jones v. Gordon* between substantive challenges to an agency action—to which a statute of limitations applies—and procedural NEPA challenges—to which the limitations period does not apply.  *See Park Cnty.*, 817 F.2d at 616 ("The thrust of our reasoning parallels that of the Ninth Circuit in *Jones v. Gordon* . . . .").  But in *Turtle Island*, the Ninth Circuit noted that *Park County*'s distinction between substantive and procedural challenges for limitations purposes reflected a "misapplication of *Jones*" to the "broad wording" of Section 226-2.  *Turtle Island*, 438 F.3d at 947 n.9.  As the Ninth Circuit made clear, the "conclusion in *Jones* flowed not from any general proposition about NEPA but from a plain reading" of the particular limitations period at issue in that case.  *Id*. at 947.  Unlike the statute of limitations at issue in *Jones*, which narrowly applied to challenges to the "terms and conditions" of certain permits, *see Jones*, 792 F.2d at 824 (quoting 16 U.S.C. § 1374(d)(6)), Section 226-2 applies broadly to "a decision of the Secretary involving any oil and gas lease," 30 U.S.C. § 226-2.  Like the Magnuson Act limitations provision at issue in *Turtle Island*, "[n]othing in [Section 226-2] purports to distinguish between procedural and substantive challenges" to decisions relating to leases.  *Turtle Island*, 438 F.3d at 946; *cf. Block*, 461 U.S. at 285 (applying limitation period to challenge by State where "[t]he statutory language makes no exception for civil actions by States").  *Turtle Island* and the broad language of Section 226-2 thus fatally undermine *Park County*'s reasoning.[8]

---

[8] *Turtle Island* likewise undercuts a related decision in *Conservation Law Foundation v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001), which relied on *Park County* and *Jones* to conclude that "NEPA-only challenges may proceed pursuant to the APA, which has no time limitation, rather than pursuant to a more limited substantive statute."  *Id*. at 24.  Again, the Ninth Circuit explained that *Conservation Law Foundation* reflected the same "misreading of *Jones*" without "interpreting the relevant statutory language" at issue in the case.  *Turtle Island*, 438 F.3d at 947.

Second, applying its reading of the Ninth Circuit's decision in *Jones*, the Tenth Circuit assumed that the absence of a specific statute of limitations in NEPA meant that no limitations period applies to NEPA claims. Instead, NEPA claims were only subject to the equitable doctrine of laches. *See Park Cnty.*, 817 F.2d at 616–17. Alongside this assumption, *Park County* applied a "reasonableness standard" to the NEPA claims under review. *See id.* at 621 n.4. Taken together, these positions make clear that the *Park County* court believed that the APA—to which the general limitations period in 28 U.S.C. § 2401(a) applies and which imposes an arbitrary and capricious standard of review—does not supply the cause of action for NEPA claims. It is now well-settled, however, that the APA provides the cause of action for any NEPA claim and that such claims are subject to statutes of limitations, not simply the equitable doctrine of laches. *See supra* pp. 26, 32–33.

Because Plaintiffs' NEPA claims are unequivocally subject to the APA, they are barred by Congress's intent to preclude "any action under the Administrative Procedure Act to review a decision of the Secretary involving an oil and gas lease [that is not] initiated within 90 days after the final decision of the Secretary." 1960 U.S.C.C.A.N. 3313, 3317. Allowing Plaintiffs instead to evade Section 226-2 simply "by artful[ly] pleading" their claim as a NEPA challenge, *Block*, 461 U.S. at 285 (quotation omitted); *see also Turtle Island*, 438 F.3d at 945, when their challenge so clearly and directly relates to MLA oil and gas leasing decisions, would "resurrect the very problems that Congress sought to eliminate," *Yeutter*, 887 F.2d at 912, by imposing a 90-day limitations period: late filed legal challenges and other "obstacles" that would inhibit prompt development of oil and gas reserves. *See* 1960 U.S.C.C.A.N. at 3314–15.

Finally, the *Park County* court erroneously assumed that alleged violations of NEPA should not be subject to differing limitations periods "depending upon which statute the underlying

37

agency action is based." *Park Cnty.*, 817 F.2d at 616.  To the contrary, federal courts have long applied specific limitations periods to NEPA claims depending upon the underlying agency action, and likewise have applied specific, exclusive jurisdictional provisions depending on the context. *See supra* pp. 32–33.  In other words, it is well settled that there is no single time or forum in which to raise a NEPA claim.

Viewed as a whole, the reasoning of *Park County* cannot withstand decades of caselaw clarifying the nature and scope of NEPA claims.  This Court should, as it must, apply "the plain language," *AT&T Inc.*, 452 F.3d at 835 (quotation omitted), of Section 226-2 to bar the bulk of Plaintiffs' claims.

## III.   Plaintiffs' Failure To Raise Their Challenges Initially With Federal Defendants Bars Plaintiffs' Claims.

Even if not barred by Section 226-2's limitations period, Plaintiffs' challenges to all the APD approval decisions are barred by Plaintiffs' failure to raise their arguments to Federal Defendants first, before seeking judicial review.

"A party must first raise an issue with an agency before seeking judicial review." *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007).  "This requirement serves at least two purposes.  It ensures 'simple fairness' to the agency and other affected litigants."  *Id.*; *see also L.A. Tucker Truck Lines*, 344 U.S. at 37 ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").  "It also provides [reviewing courts] with a record to evaluate complex regulatory issues; after all, the scope of judicial review under the APA would be significantly expanded if courts were to adjudicate administrative action without the benefit of a full airing of the issues before the agency." *ExxonMobil*, 487 F.3d at 962;

*see also Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 654 (1973) ("Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand.").

Because Plaintiffs do not allege that they raised any of their present challenges to BLM's APD approval decisions with BLM before filing this lawsuit, their claims cannot proceed.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." (citation omitted)); *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 10–13 (D.D.C. 2013) (holding that ESA citizen suit provision does not preclude application of issue exhaustion).  That the statute underlying the challenged APD approval decisions—the MLA— does not expressly require a litigant first to seek rehearing before the agency is irrelevant—as here, the Plaintiffs' "error was not failing to seek rehearing, but rather failing to raise the issue[s] at all" before BLM.  *ExxonMobil*, 487 F.3d at 962.  Plaintiffs' "failure to raise these objections to the agency waives them."  *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012).

Plaintiffs complain that BLM's online documentation of its APD approval process is a "labyrinthian maze" that "frustrates" public monitoring of, among other things, NEPA compliance. *See* Amend. Compl., ¶¶ 109–17.  In short, Plaintiffs allege that their failure to first raise their arguments before BLM was "caused by the [agency's] untimely, 'obscure' and 'difficult to find' postings of the public versions of the [challenged actions] on the internet."  *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 176 (5th Cir. 2012).  But, even if true, that does not excuse Plaintiffs' failure to bring to BLM the issues raised in their legal challenges.  Even in these circumstances, "[u]nder ordinary principles of administrative law a reviewing court will not

consider arguments that a party failed to raise in timely fashion before an administrative agency." *Id*. at 174–75 (quotation omitted).

As the Amended Complaint acknowledges—and the addition of further APD challenges in the Amended Complaint confirms—information regarding both pending and approved APDs is available on BLM's websites. *See* Amend. Compl., ¶¶ 109–17. And while Plaintiffs complain generally that these online databases do not appear to include a mechanism "to comment," *id*., ¶ 115, Plaintiffs "have not expressly alleged . . . that they actually tried without success to access the plans at issue on [Interior's] website, or through visits or communications with personnel" at Interior, or attempted to submit comments—either via BLM's website or through letters to the relevant BLM offices and officials. *Gulf Restoration Network*, 683 F.3d at 178.

Nor have Plaintiffs alleged that they availed themselves of BLM's regulations providing for State Director Review. *See* 43 C.F.R. §§ 3165.3, 3185.1. Those provisions allow any party "adversely affected" by a BLM decision, including approval of an APD, to seek administrative review, and third parties have used those provisions when dissatisfied by BLM's decision to approve an APD. *See, e.g.*, *Adami Ranch LLC*, 173 I.B.L.A. 82, 83 (2007). Viewed as a whole, Plaintiffs' allegations therefore do not indicate that Federal Defendants' "actions or omissions, rather than their own inattention or unpreparedness, caused [Plaintiffs'] failure" to raise their challenges first with BLM. *Gulf Restoration Network*, 683 F.3d at 179.

Plaintiffs' alleged Notice of Intent to Sue letter under the ESA, *see* Amend. Compl., ¶¶ 7, 18, does not salvage Plaintiffs' ESA claims. While the allegations demonstrate Plaintiffs' "condemnation" of Federal Defendants' overall compliance with the ESA regarding consideration of the effects of climate change on listed species, the allegations do not indicate that the letter "specif[ies] by name or number any particular proposed" APD approval that allegedly violates the

40

ESA.  *Gulf Restoration Network*, 683 F.3d at 181; *see* Amend. Compl., ¶¶ 7, 18.  Likewise, the

allegations fail to indicate that Plaintiffs' letter "urge[d] the DOI to disapprove of any" APD that

had "not yet been acted upon."  *Gulf Restoration Network*, 683 F.3d at 181.  The Notice of Intent

to Sue letter therefore cannot satisfy Plaintiffs' obligations to raise their challenges first to the

expert agency.  *See id.* (finding that letter to agency urging changes in Interior's NEPA compliance

program did not constitute participation in proceedings regarding plans at issue).

Because of their unexcused failures to present their challenges to BLM's APD approval

decisions before filing this lawsuit, Plaintiffs' claims should be dismissed in their entirety.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Amended Complaint in its entirety

for lack of standing and for failing to raise these challenges first with Federal Defendants.  Absent

total dismissal, this Court should at least dismiss Plaintiffs' challenges to the 3,869 APD approval

decisions set out in Exhibits A and B pursuant to Section 226-2's 90-day limitations period.

Respectfully submitted,

January 20, 2023

/s/ Bret Sumner                                                  /s/  Steven J. Rosenbaum
Bret Sumner (D.C. Bar # 464494)                       Steven J. Rosenbaum (D.C. Bar # 331728)
Jim Martin (*Pro Hac Vice*)                                 Bradley K. Ervin (D.C. Bar. #982559)
Malinda Morain (*Pro Hac Vice*)                       COVINGTON & BURLING, LLP
BEATTY & WOZNIAK, P.C.                           One CityCenter
1675 Broadway St., Suite 600                     850 Tenth St., N.W.
Denver, CO 80202                                   Washington, D.C. 20001
Telephone: (303) 407-4499                       Telephone: (202) 662-6000
Fax: (800) 886-6566                            Fax: (202) 662-6291
bsumner@bwenergylaw.com                     srosenbaum@cov.com
jmartin@bwenergylaw.com
mmorain@bwenergylaw.com

*Attorneys for Intervenor-Defendant*
*American Petroleum Institute*

*Attorneys for Intervenor-Defendant*
*New Mexico Oil and Gas Association*

/s/ Andrew C. Emrich                                          /s/  Catherine E. Stetson
HOLLAND & HART, LLP                             Catherine E. Stetson (D.C. Bar #453221)

Thomas L. Sansonetti (D.C. Bar #949610)
Andrew C. Emrich (*Pro Hac Vice*)
555 17th Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8000
ACEmrich@hollandhart.com
TLSansonetti@hollandhart.com

Bryson C. Smith (D.C. Bar #1025120)
645 S. Cache Street, Suite 100
P.O. Box 68
Jackson, WY
Telephone: (307) 739-9741
BCSmith@hollandhart.com

*Attorneys for Intervenor-Defendant*
*Peak Powder River Resources, LLC*


DAVIS GRAHAM & STUBBS LLP

/s/ Mark Champoux
Kathleen C. Schroder (*Pro Hac Vice*)
Mark Champoux, Bar No. CO00114
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth St., Suite 500
Denver, Colorado 80202
Telephone: 303-892-9400
katie.schroder@dgslaw.com
mark.champoux@dgslaw.com


*Attorneys for Franklin Mountain Energy, LLC*


/s/ Andrew C. Lillie
HOLLAND & HART LLP
Andrew C. Lillie (D.C. Bar #CO0096)
Mark D. Gibson (D.C. Bar #CO0102)
555 17th Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8000
aclillie@hollandhart.com
mdgibson@hollandhart.com


*Attorneys for Intervenor-Defendant Anschutz*
*Exploration Corporation*

Sean Marotta (D.C. Bar #1006494)
Dana A. Raphael (D.C. Bar #1741559)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Nikesh Jindal (D.C. Bar #492008)
Charles J. Engel, III (D.C. Bar #359482)
Ani Esenyan (D.C. Bar #1670956)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
tengel@kslaw.com
njindal@kslaw.com
aesenyan@kslaw.com

Hadassah M. Reimer (D.D.C. #WY002)
HOLLAND & HART LLP
P.O. Box 68
Jackson, WY 83001
Telephone: (307) 734-4517
Fax: (307) 739-9544
hmreimer@hollandhart.com

Sarah C. Bordelon (D.C. Bar #987135)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
Telephone: (775) 327-3011
Fax: (775) 786-6179
scbordelon@hollandhart.com

*Attorneys for Intervenor-Defendant*
*Chevron U.S.A. Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of January, 2023, I caused a true and correct copy of the foregoing to be filed with the Court electronically and served by the Court's CM/ECF System upon all counsel of record.

*/s/  Steven J. Rosenbaum*
Steven J. Rosenbaum
