**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

       Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR,
*et al.*,

       Defendants,

and

AMERICAN PETROLEUM INSTITUTE,
*et al.*,

       Intervenor-Defendants.

No. 1:22-cv-01716-TSC

**INTERVENOR-DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

**INTRODUCTION** ........................................................................................................... 1

**ARGUMENT** ................................................................................................................... 2

**I.** **Plaintiffs Still Fail To Plausibly Allege Article III Standing.** ........................ 2

    **A.** **Plaintiffs Still Fail To Plausibly Allege Associational Standing.** ...................... 3

        **1.** **Members' general complaints of local pollution divorced from the thousands of challenged agency actions cannot establish standing.** ...................................................................................... 3

        **2.** **Circuit precedent forecloses Plaintiffs' attempt to establish standing based on their members' alleged injuries from global climate change.** ........................................................................ 9

    **B.** **Plaintiffs Still Fail To Plausibly Allege Organizational Standing.** ................. 12

**II.** **Section 226-2 Of The MLA Bars Plaintiffs' Challenges To More Than 3,800 APDs.** .................................................................................................. 14

    **A.** **Section 226-2's Plain Terms Apply Broadly to Decisions Affecting A Lease.** .................................................................................................... 14

    **B.** **Section 226-2 Applies To Plaintiffs' NEPA Claims.** ........................................ 17

    **C.** **The Extraordinary Remedy Of Equitable Tolling Does Not Apply.** .............. 20

**III.** **Plaintiffs' Failure To First Raise Their Challenges With BLM Bars Their Claims.** .................................................................................................... 23

**CONCLUSION** ............................................................................................................. 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Forest Resource Council v. Ashe*,
  946 F. Supp. 2d 1 (D.D.C. 2013) ......................................................................23

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019) ..........................................................................12

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) ............................................................................13

*Ams. for Safe Access v. DEA*,
  706 F.3d 438 (D.C. Cir. 2013) ..........................................................................13

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ..............................................................................8

*Berka v. U.S. Nuclear Regul. Comm'n*,
  2022 WL 412470 (D.C. Cir. Feb. 3, 2022) ......................................................11

*Boling v. United States*,
  220 F.3d 1365 (Fed. Cir. 2000) ........................................................................22

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) ......................................................................................16

*Bowden v. United States*,
  106 F.3d 433 (D.C. Cir. 1997) ..........................................................................21

*Chesapeake Climate Action Network v. Exp.-Imp. Bank*,
  78 F. Supp. 3d 208 (D.D.C. 2015) ....................................................................13

*Coley v. United States*,
  556 U.S. 303 (2009) ..........................................................................................18

*Committee to Save the Rio Hondo v. Lucero*,
  102 F.3d 445 (10th Cir. 1996) ........................................................................4, 5

*Ctr. for Biological Diversity v. Bernhardt*,
  490 F. Supp. 3d 40 (D.D.C. 2020) ....................................................................14

*Ctr. for Biological Diversity v. EPA*,
  861 F.3d 174 (D.C. Cir. 2017) ..........................................................7, 8, 11, 12

\* Authorities upon which we chiefly rely are marked with asterisks.

\* *Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ....................................................................10, 11, 12

*Ctr. for L. & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) ..........................................................................5

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ...........................................................................................24

*Diné Citizens Against Ruining Our Env't v. Jewell*,
312 F. Supp. 3d 1031 (D.N.M. 2018), *rev'd in part*, *Diné Citizens*, 923 F.3d
831 .......................................................................................................................6

*Diné Citizens Against Ruining Our Environment v. Bernhardt*,
923 F.3d 831 (10th Cir. 2019) ......................................................................4, 5, 6

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015) ...........................................................................................16

*Env't Working Grp. v. FDA*,
301 F. Supp. 3d 165 (D.D.C. 2018) ....................................................................13

\* *ExxonMobil Oil Corp. v. FERC*,
487 F.3d 945 (D.C. Cir. 2007) .......................................................................24, 25

\* *Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) (en banc) .........................................................4, 5, 8

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ............................................................................12

*Found. on Econ. Trends v. Watkins*,
794 F. Supp. 395 (D.D.C. 1992) ..........................................................................10

*Friends of Animals v. Ashe*,
174 F. Supp. 3d 20 (D.D.C. 2016) .......................................................................11

\* *Friends of the Earth, Bluewater Network Div. v. U.S. Dep't of Interior*,
478 F. Supp. 2d 11 (D.D.C. 2007) .....................................................................3, 7

*Galloway v. Watt*,
185 F. Supp. 3d 130 (D.D.C. 2016) .....................................................................22

*Growth Energy v. EPA*,
5 F.4th 1 (D.C. Cir. 2021) ..............................................................................4, 12

*Gulf Restoration Network v. Salazar*,
    683 F.3d 158 (5th Cir. 2012) ...........................................24, 25

*Hall v. United States*,
    566 U.S. 506 (2012)...........................................................18

*Harvey v. Udall*,
    384 F.2d 883 (10th Cir. 1967) ........................................1, 20

*Hearth, Patio & Barbecue Ass'n v. EPA*,
    11 F.4th 791 (D.C. Cir. 2021) ...........................................9

*Humane Soc'y of the U.S. v. Babbitt*,
    46 F.3d 93 (D.C. Cir. 1995)...............................................8

*Humane Soc'y of the U.S. v. Perdue*,
    935 F.3d 598 (D.C. Cir. 2019)...........................................7

*Impact Energy Res., LLC v. Salazar*,
    693 F.3d 1239 (10th Cir. 2012) ......................................21

*Irwin v. Dep't of Veterans Affairs*,
    498 U.S. 89 (1990)....................................................20, 21

* *Jackson v. Modly*,
    949 F.3d 763 (D.C. Cir. 2020).........................................21

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n*,
    569 F.3d 493 (D.C. Cir. 2009) .......................................16

*Lewis v. Casey*,
    518 U.S. 343 (1996)...........................................................4

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).........................................................10

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990).........................................................3

*Menominee Indian Tribe of Wis. v. United States*,
    577 U.S. 250 (2016)....................................................22, 23

* *Moncrief v. United States*,
    43 Fed. Cl. 276 (1999) ...........................................2, 15, 17

*N. Am. Butterfly Ass'n v. Wolf*,
  977 F.3d 1244 (D.C. Cir. 2020) ...................................................16, 19

*Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
  949 F.3d 8 (D.C. Cir. 2020) ...........................................................8, 9

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ...............................................................13

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
  170 F. Supp. 3d 6 (D.D.C. 2016) .........................................................8

*New Vision Photography Program, Inc. v. District of Columbia*,
  54 F. Supp. 3d 12 (D.D.C. 2014) ........................................................6

*Norman v. United States*,
  467 F.3d 773 (D.C. Cir. 2006) .........................................................23

* *Nuclear Energy Inst., Inc. v. EPA*,
  373 F.3d 1251 (D.C. Cir. 2004) .......................................................23

*Ohio Nuclear-Free Network v. U.S. Nuclear Reg. Comm'n*,
  53 F.4th 236 (D.C. Cir. 2022) ....................................................18, 19

*Park County Resource Council v. U.S. Department of Agriculture*,
  817 F.2d 609 (10th Cir. 1987) ...........................................17, 20, 21, 22

*Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n*,
  67 F. Supp. 3d 373 (D.D.C. 2014) ......................................................3

*Sierra Club v. DOE*,
  287 F.3d 1256 (10th Cir. 2002) ..........................................................5

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ...........................................................2

*Smith v. United States*,
  237 F. Supp. 3d 8 (D.D.C. 2017), *aff'd*, 715 F. App'x 10 (D.C. Cir. 2018)...........13

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)........................................................................2

* *U.S. ex rel. Totten v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004) .........................................................16

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) .............................................................13

* *Turtle Island Restoration Network v. United States Department of Commerce*,
  438 F.3d 937 (9th Cir. 2006) .................................................19, 20, 22

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ..............................................................................2, 25

*Washington v. Washington Metropolitan Area Transit Auth.*,
  160 F.3d 750 (D.C. Cir. 1998) .........................................................21

*WildEarth Guardians v. Haaland*,
  2022 WL 1773474 (D.D.C. June 1, 2022) ...................................17

* *WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ..................................................9, 10, 11

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) .................................................11

**Statutes**

28 U.S.C. § 2344 ....................................................................................18

30 U.S.C. § 226-2 .......................................................................... passim

Endangered Species Act ....................................................................1, 3

Freedom of Information Act ................................................................13

Magnuson Act ......................................................................................20

Mineral Leasing Act ....................................................1, 14, 17, 19, 20

National Environmental Policy Act .......................................... passim

**Other Authorities**

30 C.F.R. § 221.21(b) (1959) ............................................................18

43 C.F.R. § 3162.3-1(c) ........................................................................4

43 C.F.R. § 3162.3-1(d)–(f) ..................................................................4

43 C.F.R. § 3162.3-1(g)–(h) .................................................................4

# TABLE OF AUTHORITIES—Continued

Page

Conf. Rep. No. 86-2135 (1960) .................................................................................19

S. Rep. No. 86-1549 (1960) .....................................................................................19

# INTRODUCTION

Intervenors moved to dismiss Plaintiffs' action because, among other things, Plaintiffs failed to plausibly plead standing to assert their wide-reaching claims implicating over 4,000 applications for permits to drill ("APDs") wells across New Mexico and Wyoming. Plaintiffs essentially plead no contest to the motion's arguments; they instead construct a brand-new standing argument with different exemplar members and different alleged harms. Plaintiffs now try to establish standing by alleging that some of their members are injured by the effects of local pollution, but Plaintiffs' argument rests on Tenth Circuit precedent that rejects this Circuit's standing test. Under binding D.C. Circuit case law, even Plaintiffs' new allegations—their third attempt at alleging standing—do not add up to a sufficiently specific injury in fact. Moreover, Plaintiffs still cannot connect their purported injuries to the 4,000 discrete agency actions at issue here, let alone any particular APD approval.

Plaintiffs also offer new declarations from members proclaiming interests in everything from polar bears to coral reefs in an attempt to salvage their Endangered Species Act ("ESA") claims. But as Intervenors pointed out, D.C. Circuit case law forecloses Plaintiffs from establishing standing based on the effects of global climate change, and Plaintiffs do not seriously contend otherwise. Because Plaintiffs still fail to plausibly allege Article III standing to challenge the APDs, their Amended Complaint should be dismissed.

But even if Plaintiffs could establish Article III standing, their legal challenges largely come too late and should be dismissed. In the Mineral Leasing Act ("MLA"), Congress both directed Federal Defendants "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise," *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967), and sought to promote this developmental purpose by foreclosing any lawsuit "contesting a decision of the Secretary involving any oil and gas lease" unless filed

"within ninety days" of the Secretary's final decision.  30 U.S.C. § 226-2 ("Section 226-2").

Plaintiffs' attempts to justify their untimely challenge to more than 3,800 APDs cannot square with

the broad, plain language and clear intent of Congress in Section 226-2.  Federal Defendants'

argument that Section 226-2 is limited to agency decisions at the leasing stage is likewise contrary

to the statute's plain language and intent, as well as the Government's past reading of

Section 226-2 that convinced the Court of Federal Claims that Section 226-2 was not limited to

the "grants of leases" but rather extended to a Secretarial decision made more than a decade after

the initial decision to issue a lease.  *See Moncrief v. United States*, 43 Fed. Cl. 276, 289–90 (1999).

Finally, because "orderly procedure and good administration require that objections to the

proceedings of an administrative agency be made while it has opportunity for correction in order

to raise issues reviewable by the courts," *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S.

33, 37 (1952), Plaintiffs' failure to raise their objections first with BLM forecloses their demand

for judicial intervention.  Plaintiffs' response confuses this required exhaustion of *issues* before

the agency with the separate statutory requirement—which Intervenors do not allege—that a party

exhaust administrative appeal *remedies* prior to going to court.  Having failed to do the former,

Plaintiffs cannot now skip directly to resolution of their challenges by this Court.

## ARGUMENT

### I.    Plaintiffs Still Fail To Plausibly Allege Article III Standing.

Despite multiple chances to fix the fatal deficiencies in their standing allegations—once by

amendment and again in opposition to Intervenors' motion—Plaintiffs still fail to establish "some

concrete interest that is affected by the deprivation" of their procedural rights.  *Summers v. Earth

Island Inst.*, 555 U.S. 488, 496 (2009).  Plaintiffs have not identified any member with standing to

sue in her own right, as would be necessary to support associational standing, *see Sierra Club v.

EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002), because their members' purported harms from local

pollution or global climate change are not particularized injuries traceable to each of the challenged APD approvals. And Plaintiffs' half-hearted defense of organizational standing similarly fails to identify any cognizable harm connected to the challenged APD approvals. Because Plaintiffs still fail to plausibly allege Article III standing, their Amended Complaint should be dismissed.

### A. Plaintiffs Still Fail To Plausibly Allege Associational Standing.

#### 1. Members' general complaints of local pollution divorced from the thousands of challenged agency actions cannot establish standing.

Plaintiffs recast their standing to bring National Environmental Policy Act ("NEPA") and Federal Land Policy and Management Act ("FLPMA") claims based on alleged harms to four organization members from local oil-and-gas development generally, including traffic, industrialization, and odor. Pls.' Br. 12; ECF 93-2, Shoup Decl.; ECF 93-3, Sobel Decl.; ECF 93-4, Nichols Decl.; ECF 93-5, Molvar Decl. But because this case involves "site-specific agency action[s]," Plaintiffs must establish standing as to each action they challenge. *Friends of the Earth, Bluewater Network Div. v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 21 (D.D.C. 2007).

Plaintiffs cannot do what they have tried to do here—plot thousands of separate actions on a map, arbitrarily draw a line around them, and claim to have members with concrete interests somewhere in the resulting "APD Area." Pls.' Br. 13. That would remove the requirement that "[u]nder the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see also Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 400 (D.D.C. 2014) ("[P]laintiffs must prove separate standing as to each agency action challenged . . . ."). APDs are unlike "uniform, system-wide regulations that affect all [sites] the same," such as a rulemaking, where an organization "need only identify a single member who has standing" "as to at least one" of the sites. *Friends of the Earth*, 478 F. Supp. 2d at 16. Each

APD approval is a separate agency action on an individual application submitted "for each well." 43 C.F.R. § 3162.3-1(c), (g)–(h). Each application contains information unique to each well site, including a "drilling plan," which contains "pertinent geologic data, expected hazards, and proposed mitigation measures," and a "surface use plan," which contains "details of pad construction, methods for containment and disposal of waste material, [and] plans for reclamation of the surface." *Id.* § 3162.3-1(d)–(f); Am. Compl. ¶ 98.

"Because 'standing is not dispensed in gross,' the court must analyze separately [Plaintiffs'] Article III standing" to challenge *each* of the some-4,000 agency actions at issue. *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021) (citation omitted); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review."). Plaintiffs do not allege a "substantial probability" that any particular APD approval "created a demonstrable risk . . . of injury to the particularized interests" of their members. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) (en banc).

Plaintiffs admit as much. They contend that they need not allege injury "from each discrete APD across the 4,000+ at issue" because "[t]his *precise issue* was considered and rejected by the Tenth Circuit" in *Diné Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019). Pls.' Br. 11. But *Diné Citizens* was predicated on—and cites seven times—the Tenth Circuit's decision in *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996), which "rejected" the "D.C. Circuit's standard [that] requires a plaintiff to establish something more." 102 F.3d at 451–52 (citing *Fla. Audubon Soc'y*, 94 F.3d at 669).

In the Tenth Circuit, it may be true that a plaintiff need allege only an "increased risk of environmental harm" from the challenged agency action and identify some connection between the plaintiff and those "affected areas," *Diné Citizens*, 923 F.3d at 841 (quoting *Comm. to Save the Rio Hondo*, 102 F.3d at 451), and need not "show with certainty, or even with a substantial probability, the results of agency action," *Comm. to Save the Rio Hondo*, 102 F.3d at 452. But the D.C. Circuit disallows exactly these kinds of loose causal assumptions. Instead, it must be "substantially probable" that the challenged action will cause a "demonstrably increased risk" to a "particularized interest of the plaintiff, rather than the environment in general." *Fla. Audubon Soc'y*, 94 F.3d at 666–67.

Although Plaintiffs may want a "relaxed standard of causation for procedural injuries," Pls.' Br. 24, courts in this Circuit do "not [relax] the issues of injury in fact or causation," *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). It is not enough to allege that an agency action is a "necessary step" to advance a project that "has the potential of harming the environment." *Sierra Club v. DOE*, 287 F.3d 1256, 1265 (10th Cir. 2002). Plaintiffs must also "connect[] that substantive decision" to their members' "particularized injury," which "often proves the more critical causation question in this type of case." *Fla. Audubon Soc'y*, 94 F.3d at 668. To do so, Plaintiffs must demonstrate a "substantial probability that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff." *Id.* at 669 (citation omitted). Once the Tenth Circuit's divergent approach is set aside, Plaintiffs' standing case falls apart. Plaintiffs have no response to the extensive D.C. Circuit standing case law discussed in the opening brief. *See* Intervenors' Br. 22–24; *see also* Fed. Defs.' Br. 12–15.

Even under the Tenth Circuit's divergent approach, Plaintiffs likely could not prevail, as their Amended Complaint challenges far more APDs across a far wider area than in *Diné Citizens*. In *Diné Citizens*, all 300 APDs were clustered in a defined, recognizable geographic region near Chaco Culture National Park targeting the same geologic formation. 923 F.3d at 835, 842; *see also Diné Citizens Against Ruining Our Env't v. Jewell*, 312 F. Supp. 3d 1031, 1044 n.3 (D.N.M. 2018) ("The Mancos Shale Formation is a geologic layer within the San Juan Basin containing oil and gas . . . ."), *rev'd in part*, *Diné Citizens*, 923 F.3d 831. Here, there is no natural feature or geographic region akin to Chaco Park or the Mancos Shale tying together 4,000 wells spread across two noncontiguous States. Plaintiffs cannot solve that problem by artificially and arbitrarily designating large swaths of land an "APD Area." Pls.' Br. 13.

Turning back to this Circuit's standing requirements, Plaintiffs also do not explain how the challenged APDs cause their members' alleged injuries from local pollution. The causation section of their brief discusses only their climate-change-based theory of injury. Pls.' Br. 24–26. Plaintiffs' complete failure to assert causation for their local-pollution theory of standing forfeits the issue. *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 24 (D.D.C. 2014) ("It is well-established in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, the court may treat those arguments that the plaintiff failed to address as conceded." (citation omitted)).

Even if Plaintiffs had defended causation, their newly-submitted declarations would flunk the D.C. Circuit's standard. The declarations focus on oil-and-gas development in the region generally rather than at particular sites. *See, e.g.*, Shoup Decl. ¶ 12 ("Oil and gas development has taken over the city, the surrounding area, and the region."); Sobel Decl. ¶ 16 ("When visiting this region, including areas where the challenged APDs are located, it is impossible not to notice the

impacts of oil and gas development."); Nichols Decl. ¶ 23 ("The impacts of oil and gas development on public lands . . . have disrupted my recreational enjoyment of public lands."); Molvar Decl. ¶ 17 ("Oil and gas development . . . directly negatively affects my recreational experience."). Although two members mention some sites in passing, *see* Shoup Decl. ¶ 15 (alleging she lives "½ mile from an oil and gas site"); Molvar Decl. ¶ 14 (alleging he saw "some small-scale oil development" on a recent trip), neither member alleges those sites are the result of a challenged APD. They could be referencing any oil-and-gas site anywhere in the region approved in unrelated agency actions. The declarations therefore do not establish a "substantial probability" of injury to members' aesthetic and recreational interests by local pollution from any particular well, let alone one with a challenged APD. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183–84 (D.C. Cir. 2017); *see also Friends of the Earth*, 478 F. Supp. 2d at 19.

The plaintiffs challenging park-specific regulations in *Friends of the Earth* had a similar problem. The court held that the plaintiffs' "general enjoyment of the National Parks, and the assertion that they experience injuries at unspecified parks, [wa]s insufficient to establish standing at any particular park unit, and for several of the counts in this case, particular units [we]re at issue." 478 F. Supp. 2d at 22. The court correctly refused to "assume, since it has not been alleged, that *all* listed injuries have been felt at all listed [sites], or even that *some* injury has been felt at all listed [sites]." *Id.* at 19; *see also Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 603 (D.C. Cir. 2019) (It is "settled law that courts cannot 'presume the missing facts necessary to establish an element of standing.' " (citation omitted)). The same logic applies here.

If Plaintiffs challenged just one APD, they could not establish standing by complaining about oil-and-gas development everywhere in the region. Plaintiffs would have to establish a substantial probability that the Government's alleged procedural failings as to *that single APD*

caused a demonstrably increased risk to a member's concrete recreational and aesthetic interests. *Fla. Audubon Soc'y*, 94 F.3d at 672; *Ctr. for Biological Diversity*, 861 F.3d at 183–84. The standard does not change—and is certainly not lower—simply because Plaintiffs have made the strategic decision to lump thousands of APDs into one lawsuit.

Plaintiffs' new allegations fail to plausibly allege redressability for similar reasons. Although redressability is "'relaxed' for plaintiffs asserting procedural injuries, 'relaxed' does not mean erased." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 15 (D.D.C. 2016) (citation omitted). Plaintiffs' underlying concrete injury still "remains at the heart of the redressability inquiry, even when dealing with a procedural injury." *Id.* So although Plaintiffs need not show that correcting the alleged procedural violation *would* necessarily alter the effect of the agency's action on their members' interests, they must show that it "*could* still change the substantive outcome in the [member's] favor." *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020); *see also Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) ("[T]he plaintiff must still show that the agency action was the cause of some redressable injury to the plaintiff." (citation omitted)). And here, harm to members' alleged local interests from *preexisting* oil-and-gas development could not possibly be redressed by fixing the allegedly defective new APDs.

Even Plaintiffs' members seem to recognize there is "no possibility" that their alleged local injuries can be undone. *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93, 100 (D.C. Cir. 1995). Kayley Shoup admits that preexisting oil-and-gas development has already "irrevocably altered" the region, Shoup Decl. ¶ 12, and Rebecca Sobel agrees that existing "development is unavoidable" in the "two counties in southeastern New Mexico" in which she recreates, Sobel Decl. ¶ 16. Those allegations should defeat redressability or, at minimum, render entirely speculative any possibility

that additional procedures could redress harms from local pollution. That "wholly speculative prospect of redress still does not pass muster." *Narragansett*, 949 F.3d at 13.

> ## 2. Circuit precedent forecloses Plaintiffs' attempt to establish standing based on their members' alleged injuries from global climate change.

Plaintiffs also continue to insist they have standing for their ESA claims based on members' purported injuries resulting from the effects of global climate change. Pls.' Br. 21–22. Ignoring this Circuit's holdings that Plaintiffs "cannot establish standing based on the effects of global climate change," *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013), Plaintiffs assert standing based on four new declarations from members of Plaintiff Center for Biological Diversity who assert interests in "critically endangered species [that] are imminently threatened by a warming planet," Pls.' Br. 22. A retired biologist interested in protected butterflies has also chimed in, but while he once worked at the Center, he does not allege current membership in the Center or any other Plaintiff. ECF 93-8, Nagano Decl. ¶¶ 3–4; *see also Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021) (declarations should show that identified people "are actually members of petitioner's association").

These newly submitted declarations suffer from the same problems as the Amended Complaint: They claim far-flung interests in species and lands that will allegedly be harmed by the effects of global climate change. Brett Hartl is concerned that rising global temperatures will allow mosquitos carrying avian malaria to proliferate in Hawaii, which could threaten endangered Hawaiian songbirds. ECF 93-6, Hartl Decl. ¶¶ 19–20. Steven Amstrup believes that if global warming continues, future sea ice declines will result in a two-thirds decrease in the polar bear population. ECF 93-10, Amstrup Decl. ¶ 38. Robin Silver worries that rising temperatures will harm the fragile Arizona forest home to the Mountain Graham Red Squirrel. ECF 93-9, Silver Decl. ¶¶ 14–15. Abel Valdivia fears that warming oceans and increased seawater acidity will

disrupt the "coral-symbiotic-algae relationship, leading to widespread coral bleaching and coral death." ECF 93-7, Valdivia Decl. ¶¶ 9–12. And former Center-member Christopher Nagano laments that rising sea levels will eliminate the habitats of endangered butterflies and other insects. Nagano Decl. ¶¶ 19–22. But Plaintiffs cannot establish standing based on the global effects of climate change. Intervenors' Br. 13–15, 19–25; Fed. Defs.' Br. 7–12. That is true even though Plaintiffs pursue a procedural rather than substantive theory of standing, because a procedural-injury claim "must be tethered to some concrete interest adversely affected by the procedural deprivation." *WildEarth Guardians*, 738 F.3d at 305. And the D.C. Circuit has flatly precluded alleged injuries from climate change from serving as the concrete interest needed to support a procedural theory of standing. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009); *WildEarth Guardians*, 738 F.3d at 307.

For good reason. An injury in fact must be particularized, "mean[ing] that the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 & n.1 (1992). But "climate change is a harm that is shared by humanity at large," and seeking "to prevent an increase in global temperature" is not relief "focused any more on these petitioners than it is on the remainder of the world's population," making climate change "too generalized to establish standing." *Ctr. for Biological Diversity*, 563 F.3d at 478. Allowing climate change to serve as a cognizable injury would effectively eliminate the standing requirement "for anyone with the wit to shout 'global warming' in a crowded courthouse." *Found. on Econ. Trends v. Watkins*, 794 F. Supp. 395, 401 (D.D.C. 1992) (citations omitted); *see also* Intervenors' Br. 19–20.

Climate-change-based injuries also flunk the requirement of a "causal connection between the injury and the conduct complained of." *Defs. of Wildlife*, 504 U.S. at 560. There is simply "too tenuous a causal link between . . . allegations of climate change and [agency] action." *Ctr.*

*for Biological Diversity*, 563 F.3d at 478. Plaintiffs' declarations demonstrate why. Their members allege that the challenged APDs will "bring about drilling; drilling, in turn, will bring about more oil." *Id.* at 478. These oil wells will then emit pollution. Pls.' Br. 25. The pollution "will consequently cause climate change; this climate change will adversely affect the animals and their habitat," *Ctr. for Biological Diversity*, 563 F.3d at 478, including polar bears and Hawaiian songbirds, Hartl Decl. ¶¶ 19–20; Amstrup Decl. ¶ 38. Therefore, in Plaintiffs' view, their members "are injured by the adverse effects on the animals they enjoy." *Ctr. for Biological Diversity*, 563 F.3d at 478–79. That kind of protracted causal chain is far too speculative for Article III standing.

Plaintiffs ultimately do not explain how they can establish standing based on the climate-change injuries their members assert. Plaintiffs instead invite this Court to ignore *Center for Biological Diversity* as "dicta." Pls.' Br. 24. But the D.C. Circuit has since reiterated that an "asserted injury based on climate change is not a particularized injury," *Berka v. U.S. Nuclear Regul. Comm'n*, 2022 WL 412470, at *1 (D.C. Cir. Feb. 3, 2022), and that Plaintiffs "cannot establish standing based on the effects of global climate change," *WildEarth Guardians*, 738 F.3d at 307. So has this Court. *See, e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 62 (D.D.C. 2019) ("plaintiffs challenging a BLM leasing decision could not 'establish standing based on the effects of global climate change'" (quoting *WildEarth Guardians*, 738 F.3d at 307)); *Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 29 (D.D.C. 2016) ("plaintiffs' concern that climate change would impact wildlife was too generalized and speculative to be concrete, imminent injury"). Plaintiffs' silence confirms that they have no response.

None of the handful of in-circuit cases Plaintiffs cite (at 22) found standing based on the effects of global climate change. Rather, those plaintiffs identified a specific environmental risk stemming directly from the challenged agency action. For example, plaintiffs with "concrete

aesthetic and recreational interests" in two protected insect species—the valley elderberry longhorn beetle and the Mitchell's satyr butterfly—had standing to challenge EPA's authorization of a particular insecticide that was "'highly to very highly toxic' to terrestrial insects." *Ctr. for Biological Diversity*, 861 F.3d at 183. Similarly, plaintiffs with particularized interests in the protected whooping crane and Gulf sturgeon had standing to challenge an EPA rule mandating "increased biofuel production" that created a "demonstrable risk" of habitat loss for those species through land conversion and water hypoxia. *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 593–94 (D.C. Cir. 2019). Plaintiffs also had standing to challenge the subsequent rule "[f]or substantially the [same] reasons." *Growth Energy*, 5 F.4th at 28.

Plaintiffs do not identify any similar connection between an APD in New Mexico and a polar bear in Alaska, or between an APD in Wyoming and a bird in Hawaii. Plaintiffs' sole link is climate change—the very link the D.C. Circuit has repeatedly rejected as "too generalized to establish standing." *Ctr. for Biological Diversity*, 563 F.3d at 478. As a result, the Center for Biological Diversity cannot base associational standing for its ESA claims on its members.

### B. Plaintiffs Still Fail To Plausibly Allege Organizational Standing.

In a one-page throw-away section of Plaintiffs' brief, a single Plaintiff—the Center for Biological Diversity—alleges organizational standing to bring its ESA claims, but on grounds squarely foreclosed by Circuit precedent. The Center says that BLM's supposed failure to consult under the ESA "frustrates" the Center's mission of "[p]rotecting listed species." Pls.' Br. 29; Hartl Decl. ¶ 12. Yet "frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted). Equally insufficient are the Center's allegations of diverted resources to "rulemaking petitions," "requests for policy changes," and "meetings with [government] officials." Hartl Decl. ¶ 14; Pls.' Br. 29. These are "classic lobbying" activities that amount to

"pure issue-advocacy," not Article III injury.  *Env't Working Grp. v. FDA*, 301 F. Supp. 3d 165, 171–72 & n.5 (D.D.C. 2018) (citation omitted); *see also Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("[T]he expenditure of resources on advocacy is not a cognizable Article III injury."); *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (time and money spent "submitting comments to the EPA" and "testifying before the United States Senate" do not establish Article III injury).  Plaintiffs' "FOIA litigation costs" also fail to grant standing.  *Smith v. United States*, 237 F. Supp. 3d 8, 12 (D.D.C. 2017), *aff'd*, 715 F. App'x 10 (D.C. Cir. 2018); Hartl Decl. ¶ 14.  The Center's asserted injury—that it must spend time and resources to lobby government officials—"is essentially an argument that [it] cannot allocate issue advocacy expenses in the way it would prefer, which is insufficient to establish standing." *Ams. for Safe Access v. DEA*, 706 F.3d 438, 458 (D.C. Cir. 2013).

Plaintiffs also complain that the Government's alleged procedural violations have "depriv[ed] [them] of information."  Pls.' Br. 29.  In certain cases, "a denial of access to information can work an injury in fact for standing purposes, at least where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011) (citation omitted).  But Plaintiffs' one-sentence reference to denied information hardly suffices as an allegation of informational injury, and this Court should "decline[] to manufacture and analyze an informational injury argument that Plaintiffs chose not to present or develop." *Chesapeake Climate Action Network v. Exp.-Imp. Bank*, 78 F. Supp. 3d 208, 237 n.22 (D.D.C. 2015).

At any rate, Plaintiffs could not have established an informational injury even if they tried. They do not identify any statute entitling them to information.  "[T]he ESA contains no public

disclosure requirement," and a "standalone assertion of an improper denial of information pursuant to NEPA" is not a cognizable injury. *Ctr. for Biological Diversity v. Bernhardt*, 490 F. Supp. 3d 40, 49 (D.D.C. 2020). Plaintiffs do not even allege that BLM provides information as a matter of practice, *see* Am. Compl. ¶ 112 (complaining that APD database "provide[s] no NEPA documents or information about potential environmental impacts"), or that BLM would provide any information even if Plaintiffs prevail. Plaintiffs have not plausibly alleged organizational standing.

## II. Section 226-2 Of The MLA Bars Plaintiffs' Challenges To More Than 3,800 APDs.

Plaintiffs do not dispute that the APA and ESA supply their causes of action, or that courts routinely apply specific limitation periods over the default period to NEPA claims. Instead, Plaintiffs attempt to read two restrictions into the MLA to avoid application of Section 226-2's 90-day limitation on challenges to "a decision . . . involving any oil and gas lease." Plaintiffs insist Section 226-2 is limited to (1) the leasing stage of onshore oil-and-gas development, and (2) claimed violations of the MLA rather than NEPA. Pls.' Br. 30–34. But neither limit squares with the plain text of the statute or with Congress's intent to incentivize expeditious onshore oil-and-gas development.

### A. Section 226-2's Plain Terms Apply Broadly to Decisions Affecting A Lease.

Congress barred legal challenges to oil-and-gas development in broad terms to capture *any* agency decision affecting an onshore oil and gas lease:

> No action contesting *a decision* of the Secretary *involving any oil and gas lease* shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary *relating to* such matter.

30 U.S.C. § 226-2 (emphases added); *see also* Intervenors' Br. 29 (citing cases construing key terms in Section 226-2). Plaintiffs make one conclusory assertion (at 31) that Section 226-2's "plain terms" limit it to the lease sale stage, yet they offer no textual analysis to support that assertion, an assertion at war with the broad definition of the terms "involving" and "relating to."

Intervenors' Br. 29. And their observation (at 32) that Section 226-2 predates "the advent of competitive oil and gas leasing in 1987," actually undercuts, rather than supports, their insistence that Congress's passage of Section 226-2 focused exclusively on Interior's decision to issue a lease.

Federal Defendants' contention (at 16) that Section 226-2 is limited to "agency decisions at the leasing stage" fails for similar reasons. Although Federal Defendants assert that the Government has not previously interpreted Section 226-2 to apply beyond leasing decisions, they cite no regulation or guidance in support of that statement, and the Government has in fact openly acknowledged the "broad" and "expansive" breadth of Section 226-2's language, including the terms "any," "involving" and "related to."[1] Moreover, Federal Defendants' suggestion that no court has ever interpreted Section 226-2 to apply to decisions beyond the leasing stage is incorrect. The Court of Federal Claims in *Moncrief v. United States* rejected a similar argument in a royalty dispute that arose more than a decade after the leases there were issued. The Court squarely rejected the party's arguments for restricting Section 226-2 only to "a lease grant or the validity of a lease," and instead concluded that Section 226-2 applies to a "substantive decision relating to federal leases." 43 Fed. Cl. at 290. For their part, Federal Defendants cite no court decision finding that Section 226-2 does not apply to an agency decision to approve an APD.[2]

That the specific question of Section 226-2's applicability to the approval of an APD on a federally issued lease has not previously been addressed administratively or otherwise litigated

---

[1] *See S. Utah Wilderness All. v. Bur. of Land Mgmt.*, Fed. Defs.' Mem. In Supp. of Mot. to Dismiss (Exhibit A hereto) at 6–7; *id.*, Fed. Defs.' Reply Mem. In Supp. of Mot. to Dismiss (Exhibit B hereto) at 7.

[2] Nor is this silence surprising. Litigation regarding issuance of an APD is rare and occurs most frequently in the Tenth Circuit—the location of the vast majority of onshore federal oil and gas leases—where it is subject to *Park City*'s (incorrectly) restrictive reading of Section 226-2.

says nothing about the language of the statute. On that score, the restrictive reading proposed by Plaintiffs and Federal Defendants is irreconcilable with the broad language of Section 226-2. *See Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) ("[N]either courts nor federal agencies can rewrite a statute's plain text."). Section 226-2 does not—as Plaintiffs and Federal Defendants would have it—impose a bar only on lawsuits challenging a "leasing" decision like a lease "sale" or "issuance." Rather, Section 226-2's terms apply broadly to "a decision of the Secretary *involving* any oil and gas lease." 30 U.S.C. § 226-2 (emphasis added). BLM approvals of drilling permits plainly constitute agency decisions that "involve" oil and gas leases. Indeed, drilling for (and producing) oil and gas are the very raison d'etre of oil and gas leases. Thus, the fatal defect in Plaintiffs' and Federal Defendants' reading "is the one that inheres in most incorrect interpretations of statutes: It asks . . . to add words to the law to produce what is thought to be a desirable result. That is Congress's province." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms . . . we would risk amending statutes outside the legislative process reserved for the people's representatives.").

Plaintiffs' and Federal Defendants' arguments cannot "overcome the statute's plain language, which is [the] primary guide to Congress' preferred policy." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1261 (D.C. Cir. 2020) (quotation omitted). Where, as here, "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) (quotation omitted).

## B. Section 226-2 Applies To Plaintiffs' NEPA Claims.

Plaintiffs' insistence (at 31–34) that Section 226-2 is limited to alleged violations of the MLA fares no better. Plaintiffs rely almost exclusively on district court decisions within the Tenth Circuit, which are compelled to follow *Park County Resource Council v. U.S. Department of Agriculture*, 817 F.2d 609 (10th Cir. 1987), even though that misguided decision has been fatally undermined by subsequent caselaw, *see* Intervenors' Br. 35–38, as fully acknowledged by Federal Defendants, *see* Exh. A and B. Plaintiffs' two district court cases outside the Tenth Circuit are likewise unpersuasive because both mechanically cited Tenth Circuit precedent without discussion. Pls.' Br. 32 (citing *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 2022 WL 16704444 (W.D. La. Oct. 5, 2022), and *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127 (D. Mont. 2004)). And *Moncrief* rejected the kind of narrow reading Plaintiffs assert now, without addressing the applicability of Section 226-2 to NEPA (or any other APA-based) claims. 43 Fed. Cl. at 290; *supra* p.15.[3]

Notably, Plaintiffs do not attempt to defend *Park County*'s faulty and heavily criticized reasoning for exempting NEPA claims from Section 226-2. Instead, Plaintiffs first contend (at 32) that Section 226-2 was enacted in 1960, and therefore could not have been intended "to apply to present-day oil and gas leasing" (created in 1987) or to claimed violations of NEPA (enacted in 1970). Plaintiffs again ignore the expansive language of Section 226-2, which covers any

---

[3] *WildEarth Guardians v. Haaland*, 2022 WL 1773474 (D.D.C. June 1, 2022), *see* Pls.' Br. 30–31, is not to the contrary. That decision involved the highly deferential standard applicable to motions for voluntary dismissal of a complaint, *see WildEarth*, 2022 WL 1773474, at *4–5, and simply determined that application of Section 226-2 was not sufficiently well-settled to clear that bar "[w]ithout expressing any opinion on the merits," *id*. at *7. But the application of Section 226-2's broad plain language is hardly unique to this case. *See* Exs. A & B; *WildEarth Guardians v. Haaland*, No. 21-cv-175, API Motion to Dismiss, Dkt. No. 28 (D.D.C.). At any rate, the absence of a prior decision does not alter the statutory language.

"decision" "involving" or "relating to" "any oil and gas lease," 30 U.S.C. § 226-2. Indeed, Plaintiffs' argument proves too much. If, as Plaintiffs argue, Section 226-2 both applies only to decisions at the leasing stage and cannot apply to present-day leasing, then the provision is superfluous. Plaintiffs' reading therefore cannot stand. *See Coley v. United States*, 556 U.S. 303, 314 (2009) (rejecting interpretation "at odds with one of the most basic interpretive canons, that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (quotation omitted)).

That lease issuance was a less formal process conducted on an "over-the-counter" basis, Pls.' Br. 32, when Congress enacted Section 226-2 in 1960 further suggests that Congress would have been less (not more) likely to focus exclusively on lease issuance. By contrast, the development step at issue in this case—approval to engage in drilling operations—existed in 1960. *See* 30 C.F.R. § 221.21(b) (1959) (a lessee "shall not begin to drill . . . without first notifying the supervisor of his plan and intention and receiving written approval prior to commencing the contemplated work"). In other words, the approval of drilling permits is a longstanding step within Congress's contemplation when it enacted Section 226-2.

Nor is it relevant that NEPA was enacted after Section 226-2. Congress is presumed to be aware of prior statutes. *Hall v. United States*, 566 U.S. 506, 516 (2012). And it is well-settled that provisions in existence before NEPA nevertheless restrict NEPA claims. For example, the Hobbs Act was adopted in 1966, *see* Pub. L. No. 89-554, 80 Stat. 622 (Sept. 6, 1966), and courts have consistently applied its statute of limitations and exclusive jurisdiction provision to NEPA claims. *See Ohio Nuclear-Free Network v. U.S. Nuclear Reg. Comm'n*, 53 F.4th 236, 239 (D.C. Cir. 2022) (dismissing NEPA challenge brought pursuant to 28 U.S.C. § 2344 because the Hobbs Act requires an "aggrieved party" to file "a timely petition for review"); *see also* Intervenors' Br. 32 (citing

cases).  Likewise, because "NEPA does not give [Plaintiffs] an independent cause of action," *Ohio Nuclear-Free Network*, 53 F.4th at 240, Plaintiffs' NEPA claims are subject to the limitations applicable to APA claims—the primary source of Plaintiffs' causes of action—which includes Section 226-2.  *See* Intervenors' Br. 26–30.

The legislative history further belies Plaintiffs' argument and confirms the broad scope of Section 226-2's language.  Congress amended the MLA in 1960 to combat "a potentially dangerous slackening in exploration for development of domestic reserves of oil and gas so necessary for our security," which had resulted in a "falling off of domestic exploration" for oil and gas on federal leases. S. Rep. No. 86-1549 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3313, 3314–15.  To promote and incentivize further oil and gas exploration and development, Congress, among other things, enacted Section 226-2 to bar "any action under the [APA] to review a decision of the Secretary involving an oil and gas lease."  *Id*. at 3317; *see also* Conf. Rep. No. 86-2135 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3315, 3337 (explaining that wording in the final version of Section 226-2 "accepted the principle" to exclude APA claims).  Here, only the plain reading of Section 226-2's broad language to bar Plaintiffs' NEPA challenges to decisions approving APDs "gives full effect to Congress' expressed interest," *N. Am. Butterfly Ass'n*, 977 F.3d at 1261, to stimulate domestic oil-and-gas development.

Having ignored Section 226-2's plain language or congressional intent, Plaintiffs next challenge Intervenors' reliance on *Turtle Island Restoration Network v. United States Department of Commerce*, 438 F.3d 937 (9th Cir. 2006).  As Intervenors in their opening brief explain (at 34–38), *Turtle Island* directly undermines the Tenth Circuit's reasoning in *Park City*, which relied on a "misapplication" of Ninth Circuit precedent.  For their part, Plaintiffs largely ignore *Turtle*

*Island*'s reasoning and instead complain that the MLA is not as "comprehensive" as the Magnuson Act regime at issue in *Turtle Island*. Pls.' Br. 33.

Plaintiffs' proposed distinction is illusory. In *Turtle Island*, the Ninth Circuit rejected *Park City*'s misreading of prior Ninth Circuit precedent to conclude that procedural claims (like NEPA) are not subject to specific limitations provisions like the one in the Magnuson Act. 438 F.3d at 947 & n.9. That rejection was not based on the "comprehensiveness" (or not) of the Magnuson Act, Pls.' Br. 33, but on the Ninth Circuit's conclusion that in construing a statute of limitations, "it is the language of the specific . . . statute . . . that controls." *Turtle Island*, 438 F.3d at 947. Notably, in criticizing *Park County*, the Ninth Circuit expressly recognized that Section 226-2 includes "broad wording," *id*. at 947 n.9, comparable to the Magnuson Act provision that did not "purport[ ] to distinguish between procedural and substantive challenges," *id*. at 946. To the extent that *Turtle Island* looked beyond the "control[ling]" language of the statute of limitations, it merely explained that the structure of the Magnuson Act—to which Plaintiffs now point—"is consistent with [the Court's] reading of the time limit." *Id*. at 947. Here, the MLA's broader structure "to promote the orderly development of the oil and gas deposits . . . through private enterprise," *Harvey*, 384 F.2d at 885, is likewise consistent with Section 226-2's design to remove obstacles to domestic development, *see* Intervenors' Br. 3–6. Plaintiffs' late-filed challenges create just such an obstacle and are therefore barred.

### C.   The Extraordinary Remedy Of Equitable Tolling Does Not Apply.

Having failed to comply with Section 226-2, Plaintiffs request (at 34) that the Court apply "equitable tolling." Although equitable tolling is potentially available to relieve a time-barred litigant, *see Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96 (1990) (recognizing availability of equitable tolling in suits against the Government), it is "appropriate only in rare instances . . .

due to circumstances external to the party's own conduct," *Jackson v. Modly*, 949 F.3d 763, 778 (D.C. Cir. 2020) (quotation omitted), and is granted "only sparingly," *Irwin*, 498 U.S. at 94.

To demonstrate an entitlement to this rare remedy, Plaintiffs "must show (1) that [they have] been pursuing [their] rights diligently, and (2) that some extraordinary circumstances stood in [their] way." *Jackson*, 949 F.3d at 778 (quotation omitted). For example, equitable tolling may be justified "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin*, 498 U.S. at 94; *see also Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245 (10th Cir. 2012) ("[T]olling is appropriate when the defendant's conduct rises to the level of active deception; where a plaintiff has been lulled into inaction by a defendant, and likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights." (quotation omitted)).

Here, Plaintiffs' claim (at 34) that equitable tolling is warranted because they believed that *Park County* and its Tenth Circuit progeny settled the inapplicability of Section 226-2 to NEPA claims does not "meet the high threshold for applying this rare remedy." *Jackson*, 949 F.3d at 778.

First, there is no indication that any extraordinary events outside Plaintiffs' control, let alone any misconduct by Federal Defendants, concealed the APD approval decisions or otherwise misled Plaintiffs to file their claims after the 90-day limit prescribed by Section 226-2. *See, e.g.*, *Irwin*, 498 U.S. at 96 (equitable tolling may be justified where adversary "tricked" a party into missing limitations period through "misconduct"); *Washington v. Washington Metropolitan Area Transit Auth.*, 160 F.3d 750, 752–53 (D.C. Cir. 1998) (tolling appropriate "where, for example, a defendant engaged in affirmative misconduct or misled a plaintiff about the running of a limitations period" (quotations omitted)); *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir.

1997) (listing affirmative actions of adversary that may support equitable tolling); *Galloway v. Watt*, 185 F. Supp. 3d 130, 134 (D.D.C. 2016) (distinguishing instances of "attorney misconduct" or "misrepresentation" that may support equitable tolling). To the contrary, Plaintiffs describe a process for searching BLM's "databases for its system of proposing, analyzing, and approving APDs." Amend. Compl., ¶ 109; *see also id.* ¶¶ 110–16. Indeed, despite their complaints regarding the user-friendliness of BLM's online databases, Plaintiffs' challenge in this case to nearly 600 APDs issued within 90 days of the Complaint—and more than 400 additional APDs issued within 90 days of the Amended Complaint—demonstrates Plaintiffs' ability timely to learn of and challenge Federal Defendants' approval decisions. *See* Exhibit C (APDs issued within 90 days of the Complaint according to Complaint Appendices A & B); Exhibit D (APDs issued within 90 days of the Amended Complaint according to Amended Complaint Appendix A).

Second, neither *Park County* nor the numerous Tenth Circuit district court decisions bound to follow it are binding on this Court, where Plaintiffs chose to file their claims. And, as explained above, the Ninth Circuit's *Turtle Island* decision had already expressly criticized *Park County*, including its central reliance on the Ninth Circuit's earlier decision in *Jones v. Gordon* in applying Section 226-2. *See Boling v. United States*, 220 F.3d 1365, 1374 (Fed. Cir. 2000) (noting lack of "authority which would suggest that the presence of adverse precedent automatically leads to equitable tolling"). Plaintiffs' mistaken reliance on questionable precedent in another Circuit falls well short of clearing the high bar necessary to justify equitable tolling. *See Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 257–58 (2016) (explaining that party's mistaken view

of the law did not support equitable tolling, and differed from "relying on actually binding precedent that is subsequently reversed").[4]

That Plaintiffs can state a defective purported excuse for ignoring Section 226-2 is of no moment. *See Norman v. United States*, 467 F.3d 773, 775–76 (D.C. Cir. 2006) (equitable tolling is a rare remedy inapplicable to "a garden variety claim of excusable neglect" (quoting *Irwin*, 498 U.S. at 96)). Combining more than 4,000 APDs issued over a period of 20 months into one legal challenge is simply Plaintiffs' litigation decision. In this light, Plaintiffs' decision to file their legal challenges initially in June 2022 reflects a conscious strategy, and the rare remedy of equitable tolling does not protect Plaintiffs from their own decisions.

## III. Plaintiffs' Failure To First Raise Their Challenges With BLM Bars Their Claims.

Plaintiffs have not justified their failure to comply with the "hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004); *see also id.* at 1290 (party must give "the agency a fair opportunity to entertain [a legal or factual argument] in the administrative forum before raising it in the judicial one"). Plaintiffs fail even to address the extensive precedent cited by Intervenors. *See* Intervenors' Br. 38–40.

Instead, Plaintiffs insist (at 35) they were not required "to exhaust administrative remedies." But Plaintiffs mistake the "exhaustion of administrative *remedies*" that is rooted in, among other things, APA Section 704, with the separate "judicially created doctrine of *issue* exhaustion." *Am. Forest Resource Council v. Ashe*, 946 F. Supp. 2d 1, 10–11 (D.D.C. 2013)

---

[4] Notably, the Court in *Menominee Indian Tribe* did not decide if overruling precedent justified equitable tolling. 577 U.S. at 258 n.4 (noting lower court's "speculat[ion]" that it "might merit tolling").

(emphases in original). Intervenors do not contend that Plaintiffs failed, after each APD approval was issued, to exhaust any particular administrative appeal remedy prior to going to court. Plaintiffs' "error was not failing to seek" a specific administrative remedy, "but rather failing to raise the issue[s] at all" before the agency, *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007), and providing BLM an opportunity "to give the issue[s] meaningful consideration," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004).

In that vein, Plaintiffs' arguments regarding BLM State Director Review, Pls.' Br. 37, are misplaced. Intervenors simply posited Director Review as an example of ways in which Plaintiffs could have made their objections known to BLM before filing suit. Among other things, prior to the APDs being approved, Plaintiffs also could have sent a letter to BLM, or traveled in person to the relevant BLM office to review APD records and lodge objections directly with the agency. But Plaintiffs do not allege or argue that they actually tried without success to access and object to "the plans at issue on the [BLM] website, or through visits or communications with personnel" at agency offices. *See Gulf Restoration Network v. Salazar*, 683 F.3d 158, 177–78 (5th Cir. 2012). Nor do Plaintiffs deny that they could have submitted letters to relevant BLM officials.

Plaintiffs' allegations that searching Interior's records and submitting comments online may not be simple or immediately intuitive, *see* Amend. Compl. ¶¶ 109–17, do not foreclose the available options and are beside the point. To the extent that Plaintiffs cite any authority to support their contentions, those authorities are unhelpful. They either do not relate to the proposition for which Plaintiffs cite them, *see* Pls.' Br. 35 (citing *Ctr. For Biological Diversity*, 861 F.3d at 186), or Plaintiffs' reliance is undercut by their (1) acknowledgement of their ability timely to search BLM files for pending and approved APDs, and (2) failure to pursue other options despite knowledge of APD approvals. Indeed, a review of BLM's "E-Planning" website Plaintiffs

reference (at 36) demonstrates that information regarding pending APDs can be obtained, including with an express option for interested members of the public to submit comments to the agency online.[5]

That making their views known to BLM required some amount of effort does not relieve Plaintiffs of the obligation first to raise issues with the agency—where they might be resolved without (or narrowed before) judicial intervention. "Simple fairness to the agency and other affected litigants" requires that a "party must first raise an issue with an agency before seeking judicial review." *ExxonMobil*, 487 F.3d at 962; *see also L.A. Tucker Truck Lines*, 344 U.S. at 37.[6]

## CONCLUSION

For the foregoing reasons, and those set forth in Intervenors' opening brief, this Court should dismiss the Amended Complaint in its entirety for lack of standing and for failing to raise these issues first with Federal Defendants. Absent total dismissal, this Court should at least dismiss Plaintiffs' challenges to the 3,869 APD approval decisions set out in Exhibits A and B to Intervenors' opening brief pursuant to Section 226-2's 90-day limitations period.

Respectfully submitted,

April 7, 2023

/s/ Bret Sumner
Bret Sumner (D.C. Bar #464494)
Jim Martin (*Pro Hac Vice*)
Malinda Morain (*Pro Hac Vice*)

/s/  Steven J. Rosenbaum
Steven J. Rosenbaum (D.C. Bar #331728)
Bradley K. Ervin (D.C. Bar #982559)
COVINGTON & BURLING, LLP

---

[5] *See, e.g.*, BLM, Carlsbad Field Office New Mexico, National NEPA Register, DOI-BLM-NM-P020-2023-0169-EA, https://eplanning.blm.gov/eplanning-ui/project/2022643/570 (last visited March 23, 2023).

[6] Plaintiffs' belated submission of their Notice to Sue Letter, Hartl Decl., Ex. 6-A, does not salvage their ESA claims. The letter still does not: (1) "specify by name or number any particular proposed" APD approval—though the letter references an appendix that is not provided, *id.* at 9; or (2) "urge the [agency] to disapprove of any" particular APD that had "not yet been acted upon." *Gulf Restoration Network*, 683 F.3d at 181. More fundamentally, Plaintiffs' broad-based letter of programmatic "condemnation of [BLM]'s policy and past practices," *id.*, is not the prospective airing of issues that provides BLM a meaningful opportunity of consideration.

BEATTY & WOZNIAK, P.C.
1675 Broadway Street, Suite 600
Denver, CO 80202
Telephone: (303) 407-4499
Fax: (800) 886-6566
bsumner@bwenergylaw.com
jmartin@bwenergylaw.com
mmorain@bwenergylaw.com

*Attorneys for Intervenor-Defendant*
*New Mexico Oil and Gas Association*

/s/ Andrew C. Emrich
Thomas L. Sansonetti (D.C. Bar #949610)
Andrew C. Emrich (*Pro Hac Vice*)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8000
ACEmrich@hollandhart.com
TLSansonetti@hollandhart.com
Bryson C. Smith (D.C. Bar #1025120)
HOLLAND & HART LLP
645 S. Cache Street, Suite 100
P.O. Box 68
Jackson, WY
Telephone: (307) 739-9741
BCSmith@hollandhart.com

*Attorneys for Intervenor-Defendant*
*Peak Powder River Resources, LLC*

/s/ Mark Champoux
Kathleen C. Schroder (*Pro Hac Vice*)
Mark Champoux (Bar #CO00114)
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
katie.schroder@dgslaw.com
mark.champoux@dgslaw.com

*Attorneys for Intervenor-Defendant*
*Franklin Mountain Energy, LLC*

/s/ Andrew C. Lillie

One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com

*Attorneys for Intervenor-Defendant*
*American Petroleum Institute*

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar #453221)
Sean Marotta (D.C. Bar #1006494)
Dana A. Raphael (D.C. Bar #1741559)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com
Nikesh Jindal (D.C. Bar #492008)
Charles J. Engel, III (D.C. Bar #359482)
Ani Esenyan (D.C. Bar #1670956)
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Telephone: (202) 737-0500
Fax: (202) 626-3737
tengel@kslaw.com
njindal@kslaw.com
aesenyan@kslaw.com

Hadassah M. Reimer (D.D.C. #WY002)
HOLLAND & HART LLP
P.O. Box 68
Jackson, WY 83001
Telephone: (307) 734-4517
Fax: (307) 739-9544
hmreimer@hollandhart.com

Sarah C. Bordelon (D.C. Bar #987135)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
Telephone: (775) 327-3011

HOLLAND & HART LLP
Andrew C. Lillie (D.C. Bar #CO0096)
Mark D. Gibson (D.C. Bar #CO0102)
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8000
aclillie@hollandhart.com
mdgibson@hollandart.com

*Attorneys for Intervenor-Defendant
Anschutz Exploration Corporation*

Fax: (775) 786-6179
scbordelon@hollandhart.com

*Attorneys for Intervenor-Defendant
Chevron U.S.A. Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April, 2023, I caused a true and correct copy of the foregoing to be filed with the Court electronically and served by the Court's CM/ECF System upon all counsel of record.

/s/ *Steven J. Rosenbaum*
Steven J. Rosenbaum