IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, )
                                               )     Case No. 1:22-cv-1716/tsc
       Conservation Groups, )
                                               )
v. )
                                               )
U.S. DEPARTMENT OF THE INTERIOR, *et al.*, )
                                               )
       Defendants. )
_____)

---

**PLAINTIFF CONSERVATION GROUPS' REPLY MEMORANDUM TO
DEFENDANTS' RESPONSE TO INTERVENOR-DEFENDANTS' CONSOLIDATED
MOTION TO DISMISS**

---

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT……………………………………………………...…..1

ARGUMENT………………………………………………………………...….……….2

I.    CONSERVATION GROUPS MEET ALL STANDING REQUIREMENTS FOR THEIR NEPA AND FLPMA CLAIMS……..……………………………………………2

II.   CONSERVATION GROUPS MEET ALL STANDING REQUIREMENTS FOR THEIR ESA CLAIMS…………………………………………………………………7

    A.    Conservation Groups Have Demonstrated Injury in Fact…………………………7

    B.    Conservation Groups Have Demonstrated Sufficient Causation and Redressability for an ESA Procedural Claim………………………...………..11

    C.    Impacts to Endangered Species from Climate Change Are Not Immune from Judicial Scrutiny…………………………………………………………………13

CONCLUSION………………………………………………………………………..19

# TABLE OF AUTHORITIES

**Cases**                                                             **Page**

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019)………………………………………………11, 12, 15, 18

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017)……………………...………………………..11, 12, 15, 16

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009)………………………………………………….3, 7, 8, 9

*Diné CARE v. Bernhardt*,
    923 F.3d 831 (10th Cir. 2019)…………………………….…………………………5, 6

*Fla. Aububon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996)………………………….……………………13

*Fla. Key Deer v. Stickney*,
    864 F. Supp. 1222 (S.D. Fla. 1994)……………………………………………...17

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.,*
    528 U.S. 167 (2000)………………………………………………...…….2, 5, 14

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021)………………………………………,,………..11, 12, 15, 18

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)……………………………………………………...…13

*Nat'l Fam. Farm Coal. v. EPA*,
    966 F.3d 893 (9th Cir. 2020)………………………………….……………16

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013)…………………………...…………………6

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017)……………………………………………18

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)………………………………………………….2, 6

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019)……………………………….………………18

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978)…………………………………………………..……………………16

*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985)……………………………………………………………16

*WildEarth Guardians v. Jewell,*
  738 F.3d 298 (D.C. Cir. 2012)……………………………………….....………..3, 7, 8

*WildEarth Guardians v. Salazar*,
  880 F. Supp. 2d 77 (D.D.C. 2012), *aff'd, WildEarth Guardians v. Jewell,* 738 F.3d
  298 (D.C. Cir. 2012)…………………………………………………….…………...7, 8

*WildEarth Guardians v. U.S. Dep't of Agric.*,
  795 F.3d 1148 (9th Cir. 2015)…………………….…………………………………..13

*\*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019)……………………………………………....2, 5

*350 Montana v. Haaland,*
  29 F.4th 1158 (9th Cir. 2022)……………………………………………………....18

## Federal Statutes

16 U.S.C. § 1536(a)…………………..………………………………………………18

## Federal Regulations

50 C.F.R. § 402.02……………………………...………………………………….14

## Other Authorities

87 Fed. Reg. 72,674, 72,682 (Nov. 25, 2022)………………………………….....10

Department of the Interior Releases Multiagency Strategy for Preventing Imminent
Extinction of Hawaiʻi Forest Birds, Dec. 12, 2022,
https://www.doi.gov/pressreleases/department-interior-releases-multiagency-strategy-preventing-imminent-extinction...........................................................................................10

https://www.census.gov/quickfacts/fairfaxcountyvirginia.............................................3

https://www.unitconverters.net/area/acres-to-square-miles.htm....................................5

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs Center for Biological Diversity ("Center"), Citizens Caring for the Future, New Mexico Interfaith Power and Light, and WildEarth Guardians (collectively, "Conservation Groups") establish Article III standing for all claims brought in their Amended Complaint through their Response to Defendant-Intervenors Consolidated Motion to Dismiss ("Conservation Groups' Response") and attached declarations. *See* ECF 93. However—without the benefit of Conservation Groups' Response—Defendants U.S. Department of the Interior, U.S. Bureau of Land Management ("BLM"), Secretary Debra Haaland, and Director Tracy Stone-Manning ("Defendants") argue in their Response to Defendant-Intervenors Consolidated Motion to Dismiss ("Defendants' Response") that Conservation Groups have not met standing requirements, either through their allegations of non-climate-based harms or climate-based harms. ECF 91 at 7-15. Defendants are wrong.

Conservation Groups have established standing for their National Environmental Policy Act ("NEPA") and the Federal Land Policy Management Act ("FLPMA") claims based on non-climate-based harms. Conservation Groups submitted four declarations from members who use and enjoy the affected areas in New Mexico and Wyoming—Kayley Shoup [Ex. 2], Rebecca Sobel [Ex. 3], Jeremy Nichols [Ex. 4], and Erik Molvar [Ex. 5]—along with maps of the locations of all applications for permits to drill ("APD") challenged, prepared by Center Geographic Information System Specialist Kara Clauser [Ex. 1] (attaching Exs. 1-A, 1-B, 1-C, 1-D). This demonstration fully satisfies all standing requirements Defendants contend Conservation Groups must meet for their NEPA and FLPMA claims. *See* ECF 93 at 10-21.

Conservation Groups have also established standing for their Endangered Species Act ("ESA") claims based on climate harms to threatened and endangered species. As with their

NEPA and FLPMA claims, Conservation Groups' declarations amply demonstrate concrete and particularized interests in species and habitats threatened by greenhouse gas pollution. Under the relaxed standards for procedural injuries, Conservation Groups have shown sufficient causation and redressability to maintain their challenge. A contrary ruling would carve an extraordinary and unwarranted exemption into the ESA's procedural safeguards and frustrate congressional intent.

Conservation Groups have established standing for all claims brought; none should be dismissed.

## ARGUMENT

## I. CONSERVATION GROUPS MEET ALL STANDING REQUIREMENTS FOR THEIR NEPA AND FLPMA CLAIMS

In their Response, Defendants correctly contend, for Conservation Groups' NEPA and FLMPA claims, that "'[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.'" ECF 91 at 12 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Defendants acknowledge that Conservation Groups may define the "affected area" in "any number of overlapping ways, such as by visual site lines . . . ." *Id.* at 13.

Defendants also correctly contend that, for their NEPA and FLMPA claims, Conservation Groups must "demonstrate 'concrete and particularized injury which has occurred or is imminent *due to* geographic proximity to the action challenged.'" *Id.* (citing *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 61 (D.D.C. 2019) (quotation omitted). Defendants acknowledge that Conservation Groups may demonstrate injury through allegations of harms that are not climate

related. ECF 91 at 1-2, 8-9 n.5, 12 (citing *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009); *WildEarth Guardians v. Jewell,* 738 F.3d 298, 308 (D.C. Cir. 2012)).

While Defendants argue that Conservation Groups fall short of meeting these requirements, Conservation Groups' standing declarations cure all claimed defects alleged by Defendants. Defendants wrongly assert that Conservation Groups failed to "define the geographic area" affected by the challenged APDs. ECF 91 at 5. Conservation Groups in fact defined the geographic areas affected in New Mexico and Wyoming by mapping the locations of *all* 4,019 APDs challenged in this action. *See* Clauser Decl., ¶¶ 3-5 [Ex. 1]; map of New Mexico APD locations [Ex. 1-A]; map of New Mexico APD locations and place names [Ex. 1-B]; map of Wyoming APD locations [Ex. 1-C]; map of Wyoming APD locations and place names [Ex. 1-D]. Drawing a line around the APDs in New Mexico, the affected area covers no more than *419.5 square miles* ("New Mexico APD Area") and drawing a similar line around the APDs in Wyoming, the affected area covers no more than *194.5 square miles* ("Wyoming APD Area"). Clauser Decl., ¶ 6 [Ex. 1]. These two areas are circumscribed: the New Mexico APD Area is equivalent to the size of Fairfax County, Virginia, which covers 391.0 square miles, and the Wyoming APD Area is approximately one-half the size of Fairfax County.[1]

Defendants allege that Conservation Groups failed to "specify which parts" of the Permian and Powder River Basins their members "use and enjoy." ECF 91 at 4-5. Conservation Groups have in fact done so in great detail. Within the New Mexico and Wyoming APD Areas, the four declarant members identify specific cities and towns, highways and roads, rivers, and

_____

[1] https://www.census.gov/quickfacts/fairfaxcountyvirginia.

other landmarks including national parks, national grasslands, and mountain ranges they use and enjoy that will be impacted by the challenged APDs. *See, e.g.,* Shoup Decl., ¶¶ 8, 13-15, 19-23 (New Mexico); Sobel Decl., ¶¶ 9-13, 15, 25-32 (New Mexico); Nichols Decl., ¶¶ 16-19, 27, 36 (Wyoming); Molvar Decl., ¶¶ 6-7, 12-15 (Wyoming).

The specific places that the declarants use and enjoy in and around the New Mexico and Wyoming APD Areas were then mapped by Ms. Clauser on the New Mexico and Wyoming place name maps, Exs. 1-B and 1-D. The declarants' detailed declarations and the corresponding map locations demonstrate that the four declarants live, travel, and/or recreate *in and around the specific areas where the 4,000+ APDs will be drilled*, as Defendants contend must be shown.

Defendants acknowledge well settled law that Conservation Groups must allege concrete harms, "such as impairment of their recreational and aesthetic interests from local air, noise, and land pollution" to demonstrate standing. ECF 91 at 1-2. The four declarants have done just that. Their detailed declarations demonstrate that, over time, all have suffered injuries due to degradation of land and air as a result oil and gas development in the affected areas in New Mexico and Wyoming. Based on their experiences, they explain that drilling more than 3,000 additional wells in the New Mexico APD Area and almost 900 additional wells in the Wyoming APD Area will significantly harm their aesthetic and recreational enjoyment of the areas in New Mexico and Wyoming they now respectively use and enjoy and intend to use in the future. These harms—all highly likely to result from drilling the challenged APDs—include industrialization of the landscape; flaring; impairment of views through ozone and haze pollution which travels hundreds of miles; increased safety risks from truck traffic; foul smelling air from hydrogen sulfide; headaches and nausea from air pollution; light pollution; seismic activity; and, for Ms. Shoup, increased risk of cancer and endocrine disorders. *See* Shoup Decl., ¶¶ 9-24; Sobel Decl.,

¶¶ 12, 16-22, 25-32; Nichols Decl., ¶¶ 21-28, 35-36; Molvar Decl., ¶¶ 7, 13, 17, 20.

The specificity of the "areas affected" by the challenged APDs—through mapping all APDs in both states—matched with the specificity of the areas the four declarants use and enjoy—which are within and adjacent to the New Mexico and Wyoming APD Areas— demonstrate Conservation Groups' members "use the affected area." *Laidlaw,* 528 U.S. at 183. The four declarants' allegations of specific harms that will likely occur in the affected areas as a result of the challenged APDs "demonstrate 'concrete and particularized injury which has occurred or is imminent *due to* geographic proximity to the action challenged.'" *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d at 61 (quotation omitted).

Conservation Groups have established injury in fact for their NEPA and FLPMA claims consistent with what courts have required in similar cases, and consistent with what Defendants claim Conservation Groups must demonstrate. *Compare id.* at 54, 59, 61-63 (declarants' allegations of environmental harms—including industrial development, haze, and dust—found sufficient to establish standing to challenge BLM's approval under NEPA of 282 oil and gas leases through five lease sales covering over 303,000 acres[2] in Wyoming)[3]; *Diné CARE v. Bernhardt*, 923 F.3d 831, 841-43 (10th Cir. 2019) (declarants' allegations of environmental harms—including impacts to visual landscape, light pollution, increased industrialization and flaring, and increased truck traffic—in the Mancos Shale area of the San Juan Basin in

---

[2] 303,000 acres converts to approximately 473 square miles. https://www.unitconverters.net/area/acres-to-square-miles.htm.
[3] The court in *WildEarth Guardians v. Zinke* recognized that the declarants had not alleged they had visited or planned to visit specific parcels in an August 2016 lease sale, but concluded "such specificity is not necessary here, where the parcels at issue cover thousands of acres of open, undeveloped landscape, and where oil and gas development prompts 'drilling rigs that rise above the land' and create 'haze and dust in the air' that can be seen 'up to a hundred miles' away." 368 F. Supp. 3d at 62 (quoting declaration).

northeastern New Mexico—found sufficient to establish standing to challenge approximately 350 APDs under NEPA); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1148, 1154-56 (10th Cir. 2013) (declarant's allegations of environmental harms to two tar sands areas he visits, encompassing 230 and 215 square miles, found sufficient to establish standing to challenge 39 leases). In *Diné CARE,* 923 F.3d at 843, plaintiffs' members established injury with a geographic-nexus to the challenged APDs with visits to "the greater Chaco region, including areas in and around Counselor, Lybrook, and Nageezi and" visits to "the Chaco Canyon area and Chaco Park" along Highway 550—descriptions of visits comparable to those in Conservation Groups' declarations. The Tenth Circuit in that case reaffirmed its prior holding in *Palma* that:

> Neither our court nor the Supreme Court has ever required an environmental plaintiff to show that it has traversed each bit of land that will be affected by a challenged agency action." Rather, "[a] plaintiff who has repeatedly visited a particular site, has imminent plans to do so again, and whose interest are harmed by a defendant's conduct has suffered injury in fact that is concrete and particularized."

*Diné CARE,* 923 F.3d at 842 (citation omitted) (quoting *Palma*, 707 F.3d at 1156 (reversing district court's ruling that plaintiffs failed to establish standing because their declarant did not identify specific visits to each of the 39 leases challenged)).

Like the declarants in *Palma,* Conservation Groups' four declarants have "specified areas which [they have] visited, averred that these specific areas will be affected by oil and gas drilling, and stated [their] interests will be harmed by such activity. This is sufficient." 707 F.3d at 1156. Indeed, Conservation Groups' members have demonstrated their concerns are not "abstract," but that they have a "direct stake in the outcome" of this case. *Morton,* 405 U.S. at 740. They are entitled to have their NEPA and FLMPA claims heard.

II.    **CONSERVATION GROUPS MEET ALL STANDING REQUIREMENTS FOR THEIR ESA CLAIMS**

Conservation Groups' declarations and pleadings also establish their standing to challenge procedural violations of the ESA. Defendants' Response ignores case law for standing regarding procedural violations of the ESA, muddles the requirements of standing for NEPA with the proper inquiry for the ESA, and elevates dicta to make an extraordinarily expansive argument that no organization may ever—or indeed could ever—bring a standalone ESA claim related to climate change because of the need to show a "demonstrable increase in climate-based risk to any of their alleged interests." ECF 91 at 9.

A.    **Conservation Groups Have Demonstrated Injury in Fact**

Defendants point primarily to three cases to argue that Conservation Groups do not have standing to pursue their ESA consultation claims: the district court opinion in *WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77 (D.D.C. 2012) ("*Guardians I*"), the appeal of that case to the circuit court, *WildEarth Guardians v. Jewell*, 738 F.3d 298 ("*Guardians II*"), and *Center for Biological Diversity v. U.S. Department of Interior*, 563 F.3d 466.

In *Center for Biological Diversity v. U.S. Department of Interior*, the circuit court held that the petitioners *did have standing* to bring climate change claims alleging procedural violations of NEPA and the Outer Continental Shelf Lands Act related to the offshore leasing program. Indeed, that opinion states plainly: "We hold, however, that Petitioners have standing to bring their climate change claims under their procedural theory of standing." 563 F.3d at 475. Judge Rogers' concurrence reinforces the point, stating that "because the court holds petitioners *have standing to bring their climate change claims* on their 'procedural theory' of standing . . . it is unnecessary for the court to reach the question whether petitioners would also have standing

under their 'substantive theory' of standing." *Id*. at 489 (Rogers, J. concurring) (emphasis added). Moreover, that decision did *not* address standing for ESA claims because it found that those claims were not ripe. *Id.* at 483 ("Petitioners' ESA challenge at this initial stage of the Leasing Program is therefore premature"). The court was clear that "the welfare of animals is, by design, only implicated at the later stages of the program," *id.*, which this now is.

Defendants also point to *Guardians I and II* for the proposition that Conservation Groups "cannot establish standing based on the effects of global climate change." ECF 91 at 10 n.6 (citing *Guardians II*, 738 F.3d at 307). But in *Guardians II*, the court held that the plaintiffs *did* have standing to bring all their claims, including climate change claims, because plaintiffs had also shown localized harms from the procedural injuries they suffered. 738 F.2d at 308. This was because procedural injuries are "connected to their members' recreational and aesthetic injuries" and those injuries are both "caused by" and would be redressed by vacatur of the record of decision under any procedural defect. *Id*.

In *Guardians I*, the district court rejected in their entirety the plaintiffs' standing to assert claims regarding the climate change related impacts of the West Antelope coal leases in Wyoming, while allowing the plaintiffs to challenge the non-climate violations of NEPA. *Guardians I*, 880 F. Supp. 2d at 87. *Guardians II* rejected that portion of the *Guardians I* opinion prohibiting the plaintiffs from raising any of their climate claims, and did not address whether the plaintiffs could sue under the ESA for procedural violations of Section 7's consultation provisions. Echoing dicta in *Center for Biological Diversity v. U.S. Department of Interior*, *Guardians II* simply held that plaintiffs could not generically meet *substantive* standards of injury and causation for any climate change-based claims, even though, again, that court allowed the plaintiffs to present all their procedural claims. 738 F.3d at 307.

Thus, in both decisions cited by Defendants, this circuit ultimately held that plaintiffs had standing for their climate change-based claims. Both held that plaintiffs demonstrated a cognizable injury for standing purposes, and both held that the requirements of causation and redressability were met because resolving the procedural defects of the Department of the Interior's actions was connected to and would redress the injuries suffered by the plaintiffs. The lack of any specific analysis of standing with respect to ESA procedural claims renders any broader precedential value extremely limited.

Defendants' assertion that "climate-based injuries to a plaintiff's enjoyment of species and their ecosystems" are universally "insufficient to establish standing" is incorrect. ECF 91 at 8. But even if these discussions of a "substantive theory of standing" were not dicta, they are not analogous to what is alleged here. For example, in *Center for Biological Diversity v. U.S. Department of Interior*, petitioners alleged that "climate change might occur in the Arctic environment," and sought as redress to "prevent an increase in global temperature." 563 F.3d at 478. That vague notion of future injury is not what is alleged in this case.

As the Supreme Court and this circuit have long recognized, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d at 475. Contrary to Defendants' assertions, however, Conservation Groups' declarations and pleadings do not simply express a nonspecific interest in "threatened and endangered species around the world." ECF 91 at 4. Rather, in sending its notice of intent to sue Defendants, Conservation Groups identified roughly 150 species within the United States that are—based on the Department of the Interior's own assessments—harmed by climate change. Mar. 28, 2022 ltr. from B. Hartl, Center, to Hon. D. Haaland, DOI, at 25-27 [Ex. 6-A] (attached to Ex. 6).

9

Conservation Groups' declarations focus on a subset of those species, including for example the lesser prairie chicken, Hartl Decl., ¶ 30 [Ex. 6]. The southern population of the lesser prairie-chicken is highly endangered due to habitat loss from oil and gas activities across the Permian Basin, as well as climate change causing more severe droughts and extreme weather. *Id*. The range of the southern population of lesser prairie-chicken *overlaps* with the very activities in the Permian Basin being contested in this litigation, *compare* 87 Fed. Reg. 72,674, 72,682 (Nov. 25, 2022) (map showing range of lesser prairie chicken's range in New Mexico) *with* Ex. 1-A (map of New Mexico APD Area), and Conservation Groups' members are harmed as the opportunities to view lesser prairie chickens in New Mexico decline due to both the local impacts of oil and gas development, as well as the climate change caused impacts to this species. *See* Hartl Decl., ¶ 30.

Conservation Groups' declarations discuss their members' specific injuries, for example, from the loss of being able to observe and enjoy several Hawaiian songbirds, projected by the Department of the Interior to go extinct *within the next few years* due to climate change.[4] *See* Hartl Decl., ¶¶ 17-23. Likewise, member Robin Silver's declaration describes his deep personal connection and enjoyment of viewing the Mt. Graham red squirrel, whose entire global population is less than 200 individuals found on the very top of just one mountain peak, and is threatened by warming temperatures, drought and wildfires exacerbated by climate change. Silver Decl., ¶¶ 10-15 [Ex. 9]. That Conservation Groups' members have deep and significant interests in these particular species is apparent from the declarations, and Defendants

_____

[4] *See* Department of the Interior Releases Multiagency Strategy for Preventing Imminent Extinction of Hawai'i Forest Birds, Dec. 12, 2022, https://www.doi.gov/pressreleases/department-interior-releases-multiagency-strategy-preventing-imminent-extinction (last accessed April 2, 2023).

acknowledge as much. ECF 91 at 8 ("Defendants do not doubt the sincerity of these concerns and indeed they must be accepted as true at this stage."). Thus, Conservation Groups' members meet the injury requirements to show standing for the procedural injury they have suffered due to Defendants' violations of the ESA.

**B.    Conservation Groups Have Demonstrated Sufficient Causation and Redressability for an ESA Procedural Claim**

Conservation Groups also meet the requirements needed to establish causation and redressability for an ESA procedural claim. The D.C. Circuit has made clear that a claim alleging a failure to consult under the ESA is an "archetypal procedural injury," *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 592 (D.C. Cir. 2019), for which standards of causation and redressability are relaxed. *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021). To establish causation, Conservation Groups must show a connection between "the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of that procedural requirement" and "one connecting that substantive decision to the plaintiff's particularized injury." *Am. Fuel*, 937 F.3d at 592 (quoting *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017)).

Conservation Groups have alleged a concrete injury from BLM's omission of a procedural step—mainly complying with the mandatory consultation with expert fish and wildlife agencies under the ESA—to the substantive decision to approve such drilling permits. Whether or not Defendants concede they erred by failing to make a "no effect" or "may affect" finding for those species set forth in Conservation Groups' declarations, a failure to make such a finding represents a procedural violation of the ESA that can be redressed by this Court. Moreover, Conservation Groups' declarations clearly show their members believe that these

omitted procedural violations are connected to the specific and concrete injury to their interests in observing these endangered species. *See, e.g.,* Amstrup Decl., ¶¶ 58-62 [Ex. 10] (harm to polar bears from failure to consult); Nagano Decl., ¶¶ 20-27 [Ex. 8] (endangered butterflies and tiger beetles).

Conservation Groups' declarations here assert their personal connections to particular species and locations specifically impacted by greenhouse gas emissions and the injuries they will suffer by no longer being able to observe and enjoy them. They describe the ever-growing evidence of climate change impacts to species from new fossil fuel development, as well as specific risks from greenhouse gas pollution to the particular species and habitats of concern to them. *See*, *e.g*., Amstrup Decl., ¶¶ 35-54 (sea ice loss impacts to polar bears); Valdiva Decl., ¶¶ 20-29 [Ex. 7] (acidification and warming waters impacts to U.S. ESA listed corals). The declarations further assert an increased risk of harm because of Defendants' failures to follow the procedural requirements of the ESA, through which BLM could better assess the impacts of its decisions. This failure to follow the procedures of the ESA in and of itself is sufficient to show a demonstrable risk to Conservation Groups interests. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 861 F.3d at 183 n.7 (noting that even without any species-specific analysis of a pesticide, the assertion by plaintiffs that it could harm listed species "requires no great speculative leap.").

Finally, under the relaxed redressability requirement, a plaintiff "need not show that 'court-ordered compliance with the procedure would alter the final [agency decision].'" *Id.* at 185 (citation omitted). Rather, it suffices to show that "there remains at least a possibility," *Am. Fuel*, 937 F.3d at 595, the agency "could reach a different conclusion" if ordered to revisit its procedural error. *Growth Energy*, 5 F.4th at 27-28. BLM's failure to consult to assess impacts to listed species deprives Conservation Groups of that possibility and can be redressed by an order

of this Court.

The fact that greenhouse gas emissions "inflict widespread harm" should not present an "insuperable jurisdictional obstacle" to standing, particularly in a procedural case. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). As discussed further below, just because the APDs at issue here are not the sole or even primary cause of global greenhouse gas concentrations that harm listed species does not defeat causation or redressability for purposes of standing. "[T]he mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015). "So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury." *Id.*

## C. Impacts to Endangered Species from Climate Change Are Not Immune from Judicial Scrutiny

Defendants' Response urges this Court to create a sweeping loophole that would forever exempt decisions relating to endangered species harms caused by climate change from ever undergoing judicial scrutiny. This argument should be rejected in its entirety for numerous reasons.

Citing to *Fla. Aububon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996), Defendants argue that "a plaintiff challenging an agency's analysis and consultation *under NEPA and the ESA*" must show a "demonstrable increase in climate-based risk to any of their alleged interests" to demonstrate standing. ECF 91 at 9 (emphasis added). But *Florida Audubon Society* had nothing to do with the ESA. In *Florida Audubon Society* plaintiffs *only* brought a claim alleging that the Internal Revenue Service should have complied with NEPA in authorizing a tax credit for the use of a particular alternative fuel additive. Given that such tax credits would not directly impact

the plaintiffs themselves, the court did hold that to establish standing in such instances, a plaintiff must show a "demonstrable increase in risk to their particularized interest." *Id*. at 665. Factually, the case is inapposite.

From this out-of-context holding, Defendants argue that the government's actions to increase emissions could never result in a "demonstrable increase in climate-based risk" because "emissions from the challenged APDs—as opposed to the large volume of greenhouse gases already accumulated in the atmosphere in combination with other existing or future sources of greenhouse gas emissions—are of such a volume and character that they will have a demonstrable effect on Plaintiffs' climate-based harms." ECF 91 at 10-11. In other words, Defendants' view, unless plaintiffs can *substantively* prove that climate change caused specifically by emissions from APDs will demonstrably harm endangered species, then any attempt to require compliance with the very procedures that might actually provide the proof of such harm is foreclosed.

Putting aside for the moment that the standing inquiry focuses on injury to the plaintiff, and not injury to the environment, *Laidlaw*, 528 U.S. at 181, such assertions are contradicted by this circuit's case law regarding standing with respect to similar situations where a procedural violation of the ESA has been alleged. Pollution travels. And pollution causes harm to threatened and endangered species far from where it is emitted. This is why, for the entire history of the ESA, the "action area" for purposes of ESA consultations includes all areas that are "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. There has always been a clear recognition that endangered species can be harmed through a long chain of causation, far from an immediate action taken by the federal government or for that matter any other party.

14

So too, federal courts since the era of the common law have acknowledged that downstream and downwind impacts give rise to standing in the context of ordinary torts as well as in challenges to compliance with federal law. For example, in bringing their ESA consultation cases against the EPA's adoption of the Renewable Fuel Standards—where the action being challenged was a decision in Washington, D.C. at EPA headquarters—the D.C. Circuit had no difficultly concluding that the plaintiffs in *Growth Energy* and *American Fuel* did not have to claim a geographic nexus to any particular farm whose runoff is contributing to toxic algal blooms and dead zones in the Gulf of Mexico. Plaintiffs were not required to prove that a particular ounce of fertilizer among the billions of pounds applied each year across the country would worsen the dead zone in the Gulf of Mexico, or that a particular acre of habitat that might shelter a whooping crane would be converted to corn production. Nevertheless, the court concluded that it was "substantially probable" that EPA's failure to consult with the wildlife services could have "resulted in applicable volumes that 'adversely affected local conditions in Kansas, the Gulf, and the Mississippi River Basin, harming [whooping] cranes and sturgeon to the detriment'" of plaintiffs' interests. *Growth Energy*, 5 F.4th at 29 (quoting *Am. Fuel*, 937 F.3d at 594)).

Likewise, in several D.C. Circuit cases challenging EPA's failure to consult over EPA's registration of pesticides for general use, plaintiffs were not required to establish a geographic nexus with the action being approved. For example, in *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, where plaintiffs challenged a decision made by EPA in Washington, D.C., plaintiffs did not need to demonstrate precisely how and where a pesticide might be used in the future and substantively harm listed species to have standing to bring their failure to consult claims against the EPA. *Id*. at 184 (plaintiff need not "establish the merits of its case, i.e., that harm to a Center

member has in fact resulted from the EPA's procedural failures; instead, it must demonstrate that there is a 'substantial probability' that local conditions will be adversely affected and thus harm a Center member.") Nor were plaintiffs required to parse out the impacts of the future use of that allegedly "reduced risk" pesticide even though endangered species were already being harmed both by other pesticides and habitat loss. *Id*.

The Ninth Circuit's decision in *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893 (9th Cir. 2020) provides another good example of the proper showing for standing where a procedural violation of the ESA is alleged. There the government argued that an environmental group could not demonstrate injury in fact to challenge a pesticide registration because "it cannot provide that [the pesticide] has caused a decline in the monarch butterfly population." *Id*. at 909. But as in prior cases, the Ninth Circuit ruled that "a credible threat of harm is sufficient to constitute actual injury for standing purposes" and a plaintiff "need only show that the exercise of a procedural right could protect [its] concrete interests." *Id*. (citations omitted); *accord Ctr. for Biological Diversity v. EPA*, 861 F.3d at 184.

In passing many of the nation's core environmental laws, Congress intentionally included vital procedural and substantive provisions, and a citizen suit provision to effectuate compliance with both types of mandates. To be sure, the ESA differs from NEPA in that it has both procedural and substantive mandates, whereas NEPA only contains procedural ones. But if anything, given Congress' clear intent to give endangered species the highest "priority over the 'primary mission' of federal agencies," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978), "the strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) (emphasis in

original); *Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1224 (S.D. Fla. 1994) (same). Allowing agencies to ignore the direct and cumulative effect of greenhouse gas and other sources of pollution on imperiled species would promote death by one thousand cuts and frustrate the purposes of the ESA.

Defendants' argument turns these foundational premises on their head, denying a plaintiff the ability to enforce the procedural requirements of the ESA merely because of past uncertainty over the ability to demonstrate substantive harm to endangered species from climate change. While the limits of substantive climate liability may still be up for debate, the government's position here makes it all but impossible for *any* plaintiff to demonstrate harm for purposes of standing when an endangered species that has enormous aesthetic, spiritual, and emotional value for a declarant goes extinct because of climate change. But of course, the substantive, factual proof that the Defendants demand here could *only* be generated through the very consultation procedures the Department of the Interior failed to do.

Defendants deny that, as a matter of policy, the Department of the Interior is relying on the 2008 Solicitor M-Opinion to sidestep the ESA's procedural requirements with respect to climate change. Defs. Ans., ¶¶ 162, 206. Defendants' Response likewise does not explain why they have chosen to omit climate change from the strict procedural requirements of the ESA. But under Defendants' theory, the Department of the Interior will never have to justify its choice. The expert wildlife agencies will forever be exempt from determining which threatened and endangered species, and to what degree, are harmed by climate change because a plaintiff must independently complete that very same analysis just to establish standing.

Increasingly courts are acknowledging the need for federal agencies to properly assess the impacts of climate change and rejecting the notion that the science does not support

characterizing a project's emissions as "minor" when compared to global emissions. This circuit has repeatedly required agencies to calculate emissions impacts under NEPA and assess whether the project serves the public interest. *See, e.g.*, *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017). In the analogous ESA cases, *Growth Energy* and *American Fuel*, the D.C. Circuit twice held that plaintiffs had standing based on alleged harms to endangered species nearly a thousand miles from individual farms that might produce biofuels. As the Ninth Circuit recently observed, "if a project of this scale can be found to have no significant impact, virtually *every* domestic source of greenhouse gases may be deemed to have no significant impact as long as it is measured against total global emissions." *350 Montana v. Haaland,* 29 F.4th 1158, 1171 (9th Cir. 2022); *cf. Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1032 (5th Cir. 2019) (observing, in a Clean Water Act case, that a pollutant "may form a 'very small portion' of a gargantuan source of water pollution" while still 'constitut[ing] a gargantuan source of water pollution on its own terms'" (citations omitted)).

A ruling allowing Conservation Groups to proceed with their procedural ESA consultation claims does not necessarily mean that a substantive challenge on climate grounds to a federal agency's action should prevail. This case does not require finding that fossil fuel leasing jeopardizes the continued existence of polar bears or Hawaiian songbirds. But it cannot be the case that no party could ever challenge the government's failure to comply with the most important procedural requirements of the ESA.

Defendants' misreading of circuit precedent—all of which concluded that plaintiffs possessed standing—leads to an absurd result: a world where federal agencies can disregard Congress' express command to review "any action" to "insure" against jeopardy to listed species, 16 U.S.C. § 1536(a), and ignore one of the greatest threats to biodiversity in our lifetime,

with no fear of judicial review. Nothing in law or logic should compel such a result.

## CONCLUSION

For the reasons set forth herein and in Conservation Groups' Response, Conservation

Groups respectfully request that the Court deny Intervenors' Motion to Dismiss.

Respectfully submitted on April 7, 2023.

*/s/ Tannis Fox*
Tannis Fox
D.D.C. Bar No. NM010
WESTERN ENVIRONMENTAL LAW
CENTER
409 East Palace Avenue, Suite 2
Santa Fe, New Mexico 87506
(505) 629-0732
fox@westernlaw.org

*/s/ Kyle J. Tisdel*
Kyle J. Tisdel
D.D.C. Bar No. NM006
WESTERN ENVIRONMENTAL LAW
CENTER
208 Paseo del Pueblo Sur, Suite 602
Taos, New Mexico 87571
(575) 613-8050
tisdel@westernlaw.org

*/s/ Allyson Beasley*
Allyson Beasley
D.D.C. Bar No. NM009
WESTERN ENVIRONMENTAL LAW
CENTER
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
(575) 751-0351
beasley@westernlaw.org

*Attorneys for Plaintiffs Center for Biological
Diversity, Citizens Caring for the Future,
New Mexico Interfaith Power and Light, and
WildEarth Guardians*

*/s/ Jason C. Rylander*
Jason C. Rylander
D.C. Bar No. 474995
1411 K Street NW, Suite 1300
Washington, D.C. 20005
(202) 744-2244
jrylander@biologicaldiversity.org

*Attorney for Center for Biological Diversity*

*/s/ Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz
D.D.C. Bar No. CO0053
WILDEARTH GUARDIANS
301 North Guadalupe Street, Suite 201
Santa Fe, New Mexico 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org

*Attorney for WildEarth Guardians*

<u>Certificate of Service</u>

I certify that on April 7, 2023 I electronically filed the foregoing Plaintiff Conservation Groups' Reply Memorandum to Defendants' Response to Intervenor-Defendants' Consolidated Motion to Dismiss with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Tannis Fox*
Attorney for Plaintiffs
